11-2512-cv
*In re Set-Top Cable Television Box Antitrust Litigation*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term 2012

(Argued: February 19, 2013     Decided: September 2, 2016)

Docket No. 11-2512-cv

———————

ANGELA KAUFMAN, individually and on behalf of all others similarly situated, JENNY LELL, LES IZUMI, individually, JEFFREY SEALS, an individual, JASON DALEN, MATTHEW MEEDS, individually and as a representative of those persons similarly situated, ALLAN FROMEN, NOAM NAHARY, ROBERT MITCHELL, MATTHEW MCALENEY, WILLIAM STEINKE, DANIELLE KNERR,

*Plaintiffs-Appellants*,

*v.*

TIME WARNER, TIME WARNER CABLE, INC., DOES 1 through 10, inclusive,

*Defendants-Appellants*,

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————

Before:

WINTER, CHIN, AND DRONEY, *Circuit Judges*.

———————

Appeal from an order of the United States District Court for the Southern District of New York (Castel, *J.*), dismissing plaintiffs' complaint against Time Warner Cable Inc. alleging an illegal tie-in of certain cable services to the leasing of cable boxes.  We affirm.

Judge Droney dissents in a separate opinion.

AFFIRMED.

---

MICHAEL D. POSPISIL, (John F. Edgar, *on the* brief), Edgar Law Firm LLC, Kansas City, MI, *and* Robert I. Harwood, Peter W. Overs, Jr. Harwood Feffer LLP, New York, New York *for Plaintiffs-Appellants*.

MARGARET M. SWISLER (Matthew A. Brill, Jennifer L. Giordano, *on the brief*), Latham & Watkins LLP, Washington, D.C., *Defendants-Appellees*.

---

WINTER and CHIN, *Circuit Judges*:

Various subscribers to cable television services from Time Warner entities (collectively "Time Warner") commenced this action below, alleging a violation of the Sherman Act in the tying of certain premium cable television services to the leasing of "interactive" set-top cable boxes. The district court (Kevin Castel, Judge) dismissed two iterations of the complaint, including the Third Amended Complaint, the operative complaint for the purposes of this opinion. The plaintiffs appealed.

We affirm, holding that the Third Amended Complaint fails to adequately plead facts that, if proven, would establish that: (i) the set-top cable boxes and the premium programming they transmit are separate products for the purposes of antitrust law; and (ii) Time Warner possesses sufficient market power in the relevant markets to establish an illegal tie-in.

## BACKGROUND

The original complaint, filed in August 2008 in the United States District Court for the District of Kansas, alleged, *inter alia*, a violation of the Sherman Act, 15 U.S.C. § 1, in Time Warner's requiring purchasers who bought a package of television channels to lease from Time Warner cable boxes necessary to transmit that programming. Similar lawsuits were filed in other districts and,

in December 2008, the Judicial Panel on Multidistrict Litigation transferred the cases to the Southern District of New York. The plaintiffs filed their First Amended Complaint shortly thereafter. Holding that the plaintiffs failed to plead actual coercion in the alleged tying arrangement, the district court dismissed the First Amended Complaint under Fed. R. Civ. P. 12(b)(6) with leave to replead. *In re Time Warner Inc. Set-Top Cable Television Antitrust Litig.*, Nos. 08 MDL 1995, 08 Civ. 7616(PKC), 2010 WL 882989 (S.D.N.Y. Mar. 5, 2010). After a conference with the district court, the plaintiffs voluntarily withdrew the Second Amended Complaint and were granted leave to file a Third Amended Complaint (the "Complaint"). The district court dismissed the Complaint because it failed to plausibly allege market power and adverse competitive effects. *In re Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MDL 1995, 08 Civ. 7616(PKC), 2011 WL 1432036, at *13 (S.D.N.Y. Apr. 8, 2011).

The Complaint identifies the relevant tying product as "Premium Cable Services," defined as "digital cable services incorporating interactive functions." (Joint App. 174). The interactive features include program guides, parental control devices, "start over" functionality (allowing viewers to start a program from the beginning), and on demand programming of movies, sports,

2

and adult material.  Premium Cable Services require a set-top box that functions bi-directionally, *i.e.*, it is able to transmit signals from the cable provider to the consumer and vice versa.

The Complaint alleges that Time Warner, using its market power over Premium Cable Services in 53 United States markets, forces its subscribers to lease "set-top boxes" or "bi-directional cable boxes" from Time Warner, to be returned if or when the subscriptions end, as a condition of subscribing to the Premium Cable Services.  Consumers are thus not able to end a subscription and use their own cable box to buy a subscription from a new provider or receive that programming in another area.  Time Warner does not manufacture the set-top boxes it leases to subscribers; it purchases them from manufacturers such as Motorola, Scientific Atlanta, and Samsung.

The district court dismissed the Complaint largely on the grounds that the Complaint failed to distinguish between markets in which Time Warner had competition for Premium Cable Services -- 22 of the 53 markets -- or to distinguish between Time Warner's market power in basic cable services and its market power in premium services. *In re Set-Top Cable Television Box Antitrust Litigation*, 2011 WL 1432036, at *13-14.  The court held, therefore, that the

3

plaintiffs did not plausibly plead that Time Warner had the requisite market power. It granted the plaintiffs leave to replead for the fourth time. *Id.* at \*14. They instead appealed.

## DISCUSSION

We review a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*, accepting all allegations in the Complaint as true and drawing all reasonable inferences in favor of the non-moving party. *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). However, the allegations must still be "plausible," a standard that "asks for more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "a district court must retain the power to insist upon some specificity in pleading," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotations omitted).

## I.    *Tie-Ins*

A tying arrangement is "an agreement by a party to sell a product but only on the condition that the buyer also purchase[] a different (or tied) product." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56 (2d Cir. 1980) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). The fear of tie-ins is that a monopolist in one product market will seek to expand its monopoly by

4

conditioning the purchase of the monopolized product upon the purchase of a product in a separate market.

To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (quoting *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)).

Three of these elements are of particular relevance to this appeal: the tying product and tied product must be separate, *i.e.*, each must be in a separate and distinct product market; the seller must use actual coercion; and the seller must have sufficient market power in the market for the tying product to coerce the purchase of the tied product. Although these elements overlap -- the

5

"separate product" and "market power" requirements are usually essential to the coercion element -- we will discuss them separately.

The "separate product" element requires that the alleged tying product and tied product be separate, *i.e.*, they must exist in separate and distinct product markets. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19-24 & n.39 (1984) (finding separate product markets in part because the evidence showed that anesthesiologists were more akin to office-based physicians than radiologists and other hospital-based physicians), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 462-63 (1992) (finding separate and distinct product markets existed because two products had been sold separately in the past and "still [were] sold separately to self-service equipment owners"). This is because if there is no separate market for the allegedly tied product, there can be no fear of leveraging a monopoly in one market to harm competition in a second market. The second market simply does not exist.

Whether two products are "separate" for purposes of antitrust law is governed by the "consumer demand test." *See United States v. Microsoft Corp.*, 253 F.3d 34, 85-89 (D.C. Cir. 2001). As the District of Columbia Circuit has stated:

6

> The consumer demand test is a rough proxy for whether a tying arrangement may, on balance, be welfare-enhancing, and unsuited to per se condemnation. In the abstract, of course, there is always direct separate demand for products: assuming choice is available at zero cost, consumers will prefer it to no choice. Only when the efficiencies from bundling are dominated by the benefits to choice for enough consumers, however, will we actually observe consumers making independent purchases. In other words, perceptible separate demand is inversely proportional to net efficiencies. On the supply side, firms without market power will bundle two goods only when the cost savings from joint sale outweigh the value consumers place on separate choice. So bundling by all competitive firms implies strong net efficiencies. If a court finds either that there is no noticeable separate demand for the tied product or, there being no convincing direct evidence of separate demand, that the entire "competitive fringe" engages in the same behavior as the defendant then the tying and tied products should be declared one product and per se liability should be rejected.

*Id.* at 87-88 (citation omitted).

Specifically, "no tying arrangement can exist unless there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the former] separately from [the latter]." *Jefferson Parish*, 466 U.S. at 21–22; *accord Eastman Kodak*, 504 U.S. at 462. Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the

7

history of the products being, or not being, sold separately, *Eastman Kodak*, 504

U.S. at 462, or the sale of the products separately in similar markets, *Microsoft*,

253 F.3d at 87-88.

But even if there are separate product markets, a tie-in may not

violate the antitrust laws. The element of actual coercion is designed to weed out

the many cases where the bundling of separate products is due to consumer

demand. If a consumer wants to purchase a bundle of the alleged tying and tied

products, the seller is simply satisfying consumer demand and monopolization

concerns are irrelevant. Indeed, consumers often benefit from the bundling of

separate products, even where the seller has market power in one product. *See*

*id.* (discussing the "potential benefits from tying"). Where the consumer so

benefits, there cannot be coercion and the bundling does not violate the antitrust

laws. *See id*.

To illustrate, we will use examples at the ends of the illegal-legal

spectrum. First, a utility with a monopoly protected by law, but subject to price

regulation in the service it provides -- *e.g.*, electricity -- would be tempted to tie-

in an unregulated, separate product -- *e.g.*, light bulbs -- to recoup the monopoly

profit denied by the price regulation. *See* 10 Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law* ¶ 1732 (3d ed. 2011); Herbert Hovenkamp, *Federal Antitrust Policy* 436 (4th ed. 2011). Such a tie-in would serve no efficiency interest benefitting consumers and would be illegal per se. *See* Areeda & Hovenkamp ¶ 1732. However, there are countless tie-ins of physically separate products that benefit consumers and pose little, if any, risk of anticompetitive harm. At the other end of the spectrum, an unusually efficient padlock manufacturer may have all of the market for padlocks in a particular geographic area and also require a would-be purchaser of a padlock to buy a set of compatible keys packaged with the lock. This sort of tie-in has efficiency gains that benefit consumers and would be legal.[1] Between these spectrum-ending examples are a range of plentiful close cases.

The third element at issue here -- market power in the tying product -- is essential to a would-be monopolist's coercion via tie-in. Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor. "As a simple

---

[1]    A package with both a lock and keys is preferred by consumers over a lock and keys as separate products. Consumers would incur transaction costs from having to search for keys compatible with a specific lock -- packaging the products together avoids these costs. The lock and keys tie-in creates even more value to the consumer if a problem with the product arises. What if the lock will not turn? Without the tie-in, the consumer may be faced with the lock manufacturer saying the problem lies with the keys and the key manufacturer saying the problem lies with the lock.

example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." *N. Pac. Ry. Co.*, 356 U.S. at 6-7. Hence, without market power, there is little risk of anticompetitive harm from the seller's tie-in.

Market power is "the ability of a single seller to raise price and restrict output." *Eastman Kodak*, 504 U.S. at 464 (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)). It can be shown by specific evidence of a seller's ability to control prices or exclude competitors from the market. *See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995). Market share is proxy for market power. *See id.*; *Eastman Kodak*, 504 U.S. at 464. A high market share alone, however, is insufficient to infer a seller's market power if other characteristics of the product market, such as low barriers to entry, high cross elasticity of demand, or technological developments in the industry, interfere with the seller's control of prices. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98-99 (2d Cir. 1998) ("A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics."). Indeed, in a tying case, the

10

"best way" to plead market power is to allege facts that, if proven, "establish directly that the price of the tied package is higher than the price of components sold in competitive markets." *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671-72 (7th Cir. 1985) (Easterbrook, *J.*).

## II.     *Separate Product Markets*

### A.     *Cable Boxes Generally*

Cable boxes, whether interactive or not, have a physical appearance separate from the programming they receive. A layperson might view them as the equivalent of a radio, and there are similarities. A radio receives and plays signals transmitted on various frequencies by networks and independent stations, and the consumer can use the radio to navigate between programs. While rights to the programming are retained by the owners of the programming content and protected by a bar against copying and retransmission, the consumer needs no contract with the network or station to receive the programming.

Cable boxes are somewhat similar. They receive and transmit programming and allow the viewer to navigate between channels. But there are significant differences. Signals are not picked up from the air; they are received through cable lines owned by providers. A would-be viewer must subscribe to

11

one of several packages of tiered programming offered by a particular cable provider -- *e.g.*, basic, basic plus a sports package, basic plus premium -- to view various programs at various times. Networks and other content producers retain rights against copying for commercial use and the cable providers retain rights to the packages of programming. In short, cable providers sell to their subscribers rights to viewing and copying for personal use its packages of programming.

A cable box must be designed to receive the signal from a particular provider, which requires the provider's cooperation. And because providers code their signals to prevent theft, a cable box must also be able to unscramble the coded signal of the particular provider. Unsurprisingly, providers do not share their codes with cable box manufacturers.

Therefore, to be useful to a consumer, a cable box must be cable-provider specific, like the keys to a padlock. Although the plaintiffs frame their claim as a tie-in, the core issue is a cable provider's right to refuse to enable cable boxes it does not control to unscramble its coded signal.

**B.** *Allegations*

The Complaint alleges that, "[b]ut for Time-Warner's unlawful tying requirement . . . there would be a thriving market in which consumers would

12

have a choice in their purchase of cable boxes."  Joint App. 204.  However, the Complaint lacks any allegation that there have ever been separate sales of set-top boxes and cable services, whether or not "premium," in the United States, even in markets where cable providers face competition and, more specifically, in markets where Premium Cable Services are available through competing fiber optic networks that do not use set-top boxes.

The specific factual allegations that support the claim that the set-top boxes and Premium Cable Services are separate products are that:  (i) existing technology permits the sale of remotely programmable bi-directional cable boxes at retail; (ii) Time Warner does not manufacture its own bi-directional cable boxes; (iii) Time Warner separately itemizes charges for leasing bi-directional cable boxes and providing cable television services on consumers' bills; (iv) bi-directional cable boxes are sold separately at retail in markets outside of the United States, specifically South Korea; and (v) modems are sold separately from internet services in the United States.

Viewed individually or collectively, these allegations are insufficient. Allegations (i) and (ii) -- the existence of relevant technology and Time Warner's lack of manufacturing operations -- address supply-side considerations rather

13

than the character of consumer demand, *i.e.*, whether consumers would purchase cable boxes separately from cable services if given the choice. Further, we note that sellers commonly purchase components from various manufacturers and package the components together for sale as a unitary product. Thus, that Time Warner does so with set-top boxes and Premium Cable Services says little about whether there are separate product markets for these components as a matter of antitrust law. *Cf. Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703 (7th Cir. 1984) (Posner, *J.*) ("[T]o hold therefore that every composite product is a tie-in, subject to the hostile scrutiny to which antitrust law still subjects tie-ins, would place industry under a vast antitrust cloud, and has been rejected.").

In a vacuum, allegation (iii) -- Time Warner's separate itemization of charges for set-top boxes and cable services on consumer bills -- could suggest that Time Warner considers them separate products. In light of an FCC rule that compels Time Warner to separately itemize these charges, however, such an inference is not plausible. *See* 47 C.F.R. § 76.1206; *Iqbal*, 556 U.S. at 681 (weighing "allegations [that] are consistent with" liability against "more likely explanations" and concluding that the claim is not plausible).

14

As for allegation (iv) -- the availability of retail bi-directional cable boxes in some markets outside of the United States -- there is no reasonably specific allegation that those markets are sufficiently similar to the U.S. market in relevant respects such that it is plausible to infer that Time Warner's tie-in, rather than other market conditions, explains the retail unavailability of such cable boxes.[2] Notably lacking is any allegation that there has ever been separate sales of cable boxes and cable services in the United States, even in markets where cable providers are in competition with each other or with fiber optic cable services that employ different technology. *See Microsoft*, 253 F.3d at 88 ("[B]undling by all competitive firms implies strong net efficiencies.").

Similarly, as to (v), -- the separate sales of modems -- obvious differences between the provision of cable and internet services negate any inference as to separate markets for bi-directional cable boxes. As described in detail above, a cable box useful to consumers must be provider-specific, allowing consumers to subscribe to particular packages of programming, while modems, like radios, transmit all available content.

---

[2] For example, relevant characteristics of the market include, among other things, the regulatory environment, norms for the protection of intellectual property rights, security, theft propensity, and consumer preferences.

The Complaint, therefore, fails to allege facts that, if proven, would show the existence of a demand for bi-directional cable boxes separate from the demand for Premium Cable Services. Likewise, it fails to plausibly allege that consumers are coerced into "leasing" set-top boxes from Time Warner that they would otherwise purchase elsewhere.

## C. *The Regulatory Environment*

Our conclusion that the Complaint fails to plausibly allege separate product markets for bi-directional cable boxes and Premium Cable Services is supported by our examination of the relevant statutory and regulatory framework, as is required by existing law. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411-12 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," including "the existence of a regulatory structure designed to . . . . perform[] the antitrust function," which may "diminish[] the likelihood of major antitrust harm." (internal citations and quotation marks omitted)); *Taylor*, 313 F.3d at 776 (a reviewing court may consider the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and public records, when considering a motion to dismiss).

As the Complaint acknowledges, Congress has specifically addressed the tie-in issues arising from the sale of cable services with cable boxes and the FCC has been deeply involved in this issue throughout the time period covered by the Complaint. In 1996, Congress directed the FCC to "adopt regulations to assure the commercial availability of devices that consumers use to access [cable services] . . . from manufacturers, retailers, and other vendors not affiliated with" cable providers. Expanding Consumers' Video Navigation Choices; Commercial Availability of Navigational Devices, 81 Fed. Reg. 14,033, 14,033 (Mar. 16, 2016) (internal quotation omitted). Congress also directed that any such regulations must not "jeopardize security of [cable] systems, or impede the legal rights of a provider of such services to prevent theft of service." *Id.* at 14,033 (quoting 47 U.S.C. § 549(b)). In other words, since 1996, the FCC has been tasked with disaggregating set-top boxes from the cable services they deliver, or, in antitrust terms, developing separate product markets for cable boxes and cable services.

The FCC has recently acknowledged that numerous efforts to create those separate markets have failed, especially as to bi-directional cable boxes and Premium Cable Services. *See* 81 Fed. Reg. at 14,033-34. A combination of the

17

speed of technological change in the market, and various hardware, software, security, and collective-action problems have impeded the FCC's attempts to foster separate markets. *See id.* at 14,033-35 ("Cable operators used widely varying security technologies, and the best standard available to the Commission was . . . hardware based [and] worked only with one-way cable services. . . . [A] new approach that would work with two-way services [failed because it] was not sophisticated enough to meet content companies' content protection demands."). In March 2016, the FCC proposed new regulations in a further attempt to create separate markets, *see id.,* but its historic failure to do so over the time period covered by the Complaint bolsters our conclusion that the plaintiffs have not plausibly alleged separate product markets for bi-directional cable boxes and Premium Cable Services.

Moreover, though it does not touch on any of the specific elements of a tying claim discussed above, there is an FCC regulation that further renders the claims in this case implausible. *See* 47 C.F.R. § 76.923. That regulation caps the price that Time Warner or other providers may charge to lease set-top cable box equipment to consumers. *Id.* § 76.923(f)-(g) (providing that "[m]onthly charges for rental of a [cable box] unit shall consist of the average annual unit

18

purchase cost of [cable boxes] leased, including acquisition price and incidental costs such as sales tax, financing and storage up to the time it is provided to the customer, added to the product of the [hourly service charge] times the average number of hours annually repairing or servicing a [cable box], divided by 12 to determine the monthly lease rate for a [cable box]."). It also limits which maintenance and financing charges may be amortized over twelve months and provides that Timer Warner may include a "reasonable profit" in its leasing rate. *Id.* § 76.923(c).

Such a regulatory price control on the *tied* product makes the plaintiffs' tying claim implausible as a whole. We doubt that Time Warner would attempt to monopolize the market for bi-directional cable boxes when an FCC regulation caps the amount of profits that Time Warner may reap from that market. *Cf. Verizon*, 540 U.S. at 412 ("The regulatory framework that exists in this case demonstrates how, in certain circumstances, regulation significantly diminishes the likelihood of major antitrust harm." (internal quotation marks omitted)). Indeed, a typical tie-in works in the reverse of the circumstances here: Government regulation of the tying product's price will cause the monopolist to seek monopoly rents through sales of an *unregulated* tied product. *See*

Hovenkamp at 436; *cf. Eastman Kodak*, 504 U.S. at 487 ("[T]ying arrangements may be used to evade price control in the *tying product* through clandestine transfer of the profit to the *tied product*; . . . and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line." (emphases added) (quoting *Fortner Enters.*, 394 U.S. at 513–514 (White, J., dissenting))).

The insufficiency of the allegations of a separate market for bi-directional cable boxes, the inability of the FCC to create such a market, and the price regulation of the tied product further persuade us that the Complaint does not plead a plausible tying claim.

## III.   *Market Power*

We also conclude that, as the district court held, the Complaint does not plausibly allege market power in the relevant product and geographic markets.

As noted above, the Complaint defines the relevant product market as that for Premium Cable Services (a market separate from basic cable).  It identifies 53 distinct geographic markets in which Time Warner allegedly has violated the antitrust laws.  The plaintiffs were, therefore, required to allege facts

20

supporting an inference that Time Warner possessed market power in the Premium Cable Services market in each specified geographic market. *See Ill. Tool Works*, 547 U.S. at 46 ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."); *E & L Consulting*, 472 F.3d at 32 (even prior to *Twombly*, "an antitrust defendant charged with illegal tying is entitled to some specificity" as to each element of antitrust claim alleged).

Broadly, the Complaint alleges that major cable providers in the aggregate possess power over the market for basic cable in the United States. It also alleges that the firms do not generally compete with each other within the specified local markets. Further, because Time Warner "controls" the markets in which it provides basic cable services and because "the provision of Premium Cable Services relies upon the same basic infrastructure as basic cable services," the Complaint alleges that Time Warner "naturally" has market power over Premium Cable Services. Joint App. 180.

These allegations are insufficient to plead market power. They conflate the markets for basic and premium cable.[3] The plaintiffs cannot

---

[3] The plaintiffs emphasize that the packages sold by cable providers are "tiered" so that every subscriber of premium services obtains basic services from the

plausibly derive Time Warner's market power over Premium Cable Services from broad allegations about the nationwide market for basic cable. While Time Warner's delivery of Premium Cable Services depends on the technological infrastructure it uses to provide basic cable, such fact implies little about the *market* for Premium Cable Services, especially given the Complaint's allegation that Time Warner's competitors deploy different technology to provide the same product. Indeed, the Complaint alleges *no* particular facts bearing on Time Warner's share of the market for *premium*, two-way services, as opposed to basic cable services. Antitrust law requires plaintiffs to plead such facts and the plaintiffs' failure to do so means they have not plausibly pled market power. *See PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002) ("In the absence of direct measurements of a defendant's ability to control prices or exclude competition . . . market power necessarily must be determined by reference to the 'area of effective competition' -- which, in turn, is determined by reference to a specific, defined 'product market.'" (internal citations omitted)); *see also Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (a tying claim

same provider. However, it would make little commercial sense to sell basic cable services separately. In any event, an allegation of a large market share in basic services means nothing in this context because such a share tells us nothing about the market share in premium services.

is insufficient where allegations of market power are based on facts about a broader industry rather than the specific tying product market).

What is more, the Complaint alleges that Time Warner competes with other, non-cable companies in the provision of Premium Cable Services in at least 22 geographic markets. No facts are alleged, however, concerning Time Warner's share of these markets or how the presence of non-cable competitors affects Time Warner's power over price in these markets. Thus, without more specific allegations, an inference of market power is not plausible. *Cf. Tops Mkts.*, 142 F.3d at 99 (an inference of market power is appropriate "only after full consideration of the relationship between market share and other relevant market characteristics").

The Complaint, therefore, does not allege facts sufficient to infer that Time Warner possessed market power over Premium Cable Services in the 53 specified markets and the tie-in claim fails on that ground as well.

### CONCLUSION

For the reasons stated, we conclude that the Complaint fails to plausibly allege that bi-directional cable boxes are a separate product from the Premium Cable Service subscriptions they transmit. The FCC's long history of

23

regulation in this area further reinforces our conclusions.  We also conclude that

the Complaint fails to plausibly allege Time Warner's market power in the

particular product and geographic markets defined in the Complaint.

We therefore **AFFIRM**.

DRONEY, *Circuit Judge*, dissenting:

Dismissal of antitrust claims on the pleadings "should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)) (internal quotation mark omitted). In the context of tying claims, dismissal is inappropriate where a plaintiff has sufficiently alleged: (1) "a tying and a [separate] tied product;" (2) "evidence of actual coercion by the seller that forced the buyer to accept the tied product;" (3) "sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product;" (4) "anticompetitive effects in the tied market;" and (5) "the involvement of a not insubstantial amount of interstate commerce in the tied market." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (quoting *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)) (internal quotation marks omitted). The majority holds that Plaintiffs' Third Amended Complaint (the "Complaint") fails to sufficiently plead at least two of these elements: separate products and sufficient market power. I disagree and respectfully dissent.

I.

As the majority explains, our inquiry into the "separate product" element is governed by the "consumer demand test." "[W]hether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Thus, to qualify as separate, the products must be "distinguishable in the eyes of buyers." *Id.*

Here, Plaintiffs allege facts plausibly showing that Premium Cable Services and set-top cable boxes constitute separate products "distinguishable in the eyes of buyers." Plaintiffs allege that Time Warner does not design or manufacture its own cable boxes, but rather purchases boxes from three manufacturers, and that numerous other manufacturers are capable of producing cable boxes that are technologically compatible with Time Warner's services. However, even if customers could purchase cable boxes directly from any of these manufacturers, Time Warner would not allow its customers to receive Premium Cable Services without leasing a cable box from it. Plaintiffs also allege that the cost of leasing a cable box from Time Warner is charged as an additional monthly fee, and that

customers are not given the choice of purchasing their box from Time Warner. Plaintiffs further assert that robust markets for cable boxes exist in the "many countries" in which consumers are not compelled to rent cable boxes from their cable providers. Joint App. 194. Supporting this allegation are Time Warner's own statements to the FCC comparing cable boxes to cable modems—for which an open market for customer-owned devices exists—and indicating its belief that a similar market could emerge for cable boxes. Finally, Plaintiffs point to the FCC's failed CableCARD initiative as evidence that manufacturers are willing to enter the cable box market by selling directly to consumers.

Taking these factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002), I believe the Complaint plausibly alleges a separate product market for consumer-purchased cable boxes, which is suppressed by Time Warner's anticompetitive conduct.[1] In concluding otherwise, the majority imposes too high a bar on Plaintiffs.

---

[1] Notably, the district court reached the same conclusion below, holding that Plaintiffs "plausibly allege[] that cable boxes are separate and distinct from Premium Cable Services. At the pleading stage, the cable box appears to be a product that could be sold separately and profitably because every user of Time Warner's Premium Cable Service is a potential purchaser of a cable box." *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MDL 1995(PKC), 08 Civ. 7616(PKC), 2010 WL 882989, at *4 (S.D.N.Y. Mar. 5, 2010). Time Warner does not contest this determination on appeal.

3

The majority dismisses two of Plaintiffs' allegations because they "address supply-side considerations rather than the character of consumer demand." Maj. Op. at 13-14. While I agree that we must focus on consumer demand, supply-side considerations are nonetheless relevant to our inquiry. Indeed, in analyzing Plaintiffs' allegations, the majority itself relies on supply-side considerations. *See id*. at 15.

The majority focuses also on the technological challenges associated with independently manufactured cable boxes. It states that cable boxes are "cable-provider specific, like the keys to a padlock," *id*. at 12, and characterizes the "core issue" in this case as "a cable provider's right to refuse to enable cable boxes it does not control to unscramble its coded signal," *id*. But this favors the supplier's dubious technological concerns over the consumer's right to choose between competing products. *See Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1517 (2d Cir. 1989) (interpreting *Jefferson Parish* as "focus[ing] primarily on the anticompetitive effect of tying arrangements and the resultant harm to consumer choice in the tied-product market," and not on "the tying entity's interest"). *See also United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) (interpreting *Jefferson Parish* and identifying the "core concern" of tying

4

as "prevent[ing] goods from competing directly for consumer choice on their merits"). Plaintiffs also specifically allege that cable boxes are remotely programmable. In light of that allegation—which, on a motion to dismiss, we assume to be true—the majority's concern that providers will be forced to "share their codes with cable box manufacturers," Maj. Op. at 12, appears unfounded.

Finally, the majority faults Plaintiffs for failing to show that cable boxes have ever been sold separately in U.S. markets. That Plaintiffs cannot do so, though, should not be fatal to their claim—particularly at this stage of the proceedings. In any event, there is an obvious explanation for this lack of evidence: since at least 1996, cable operators have required that consumers lease set-top cable boxes to access their cable service packages.[2] It is no surprise, then, that Plaintiffs are unable to show a history of separate sales of set-top boxes and premium cable services in the United States. It is enough that Plaintiffs have instead alleged separate sales of the same product in at least one different market (South Korea), as well as separate sales of an analogous product (cable modems)

---

[2] Indeed, in response to these practices, Congress enacted Section 629 of the Telecommunications Act of 1996, which directed the FCC to "adopt regulations to assure the commercial availability[] to consumers . . . of converter boxes . . . from manufacturers, retailers, and other vendors not affiliated with any multichannel video programming distributor." 47 U.S.C. § 549(a). In implementing that legislation, the FCC noted that set-top boxes "have historically been available only on a lease basis from the service provider." *In re Implementation of Section 304 of the Telecommunications Act of 1996*, Report & Order No. 98-116, 13 FCC Rcd. 14775, 14778 (F.C.C. June 24, 1998).

in the U.S. market, to support the inference that cable boxes and cable services comprise separate, distinguishable products.

The FCC's failed efforts to disaggregate set-top cable boxes from cable services reinforce, rather than undermine, Plaintiffs' claim. That the FCC attempted to create an alternative device to cable boxes demonstrates that the FCC views cable boxes and cable services as distinct products. This view is further supported by the FCC regulation, identified by the majority, which requires Time Warner to separately itemize the fees associated with these products on consumer bills. Additionally, the FCC's failed attempts at developing an alternative device are largely attributable to solvable technological issues and resistance from cable providers, and say little about consumer demand for such a device. Thus, in my view, the regulatory environment seems to support Plaintiffs' allegations.

The majority also points to an FCC regulation, which sets a cap on the price Time Warner may charge consumers for leasing set-top cable boxes, as support for the view that Time Warner would not attempt to monopolize the cable box market when the amount of profits it may realize is so limited. But this view misjudges the regulation's effectiveness in curbing monopoly prices. The

6

FCC regulation sets a cap on leasing prices by tying those prices to the "average annual unit purchase cost" of cable boxes. 47 C.F.R. § 76.923(f). However, without a competitive market in place, cable box manufacturers lack any incentive to keep those purchase costs low. As Plaintiffs allege, Time Warner has historically purchased its cable boxes from just three suppliers, and those suppliers do not make their cable boxes available for sale to the general public. Furthermore, the FCC regulation permits cable companies to pass along to consumers the full cost of a cable box over the course of a single year, plus a "reasonable profit." 47 C.F.R. § 76.923(c), (f), (g). Yet as Plaintiffs allege, "the useful life of a cable box is between 3 and 5 years." Joint App. 197. Thus, notwithstanding the FCC's regulation, Time Warner may charge consumers fees that exceed the true cost of the cable box, thereby generating considerable profits. In fact, Time Warner's 2008 Annual Report warned investors that the emergence of a competitive market for cable boxes would threaten the substantial revenues generated from equipment rental and installation charges. I cannot conclude, then, as the majority does, that the FCC pricing regulation lessens the plausibility of Plaintiffs' claim.

In sum, taken together and viewed in a light most favorable to Plaintiffs, the allegations in the Complaint plausibly show that set-top cable boxes and Premium Cable Services are distinct products, which, if not for Time Warner's conduct, would be purchased separately by consumers.

II.

As to market power, the majority concludes that Plaintiffs: (1) fail to allege sufficient facts bearing on Time Warner's market share for premium cable services, as opposed to basic cable services; and (2) fail to allege with requisite specificity Time Warner's market share in the relevant geographic markets. I disagree.

The majority first concludes that Plaintiffs conflate the markets for basic and premium cable services. Not so. While it is true that Plaintiffs' allegations are largely drawn from data concerning the nationwide market for basic cable services, those allegations bear on Time Warner's market share in Premium Cable Services as well. As the Complaint explains, cable services are cumulative. That is, a consumer who purchases Premium Cable Services from Time Warner also necessarily receives, and pays for, basic cable services. At the same time, Plaintiffs allege that major cable companies, such as Time Warner, operate in

8

geographically discrete markets, and therefore exercise control over basic cable services in those markets. Taken together, these allegations support the reasonable inference that, if Time Warner exercises market power over basic cable services in a given market, it exercises market power over Premium Cable Services in that market as well.

The majority next concludes that Plaintiffs fail to allege "particular facts bearing on Time Warner's share of the market" for Premium Cable Services. Maj. Op. at 22. But Plaintiffs allege that, by 2009, subscriptions to Time Warner's Premium Cable Services had grown to 8.9 million, translating into a 21% share of the total premium cable market. Plaintiffs also point to the high barriers to entry facing those wishing to compete with Time Warner in that market. As a result, Time Warner's largest competitors, AT&T U-verse and Verizon FiOS, had, as of 2009, significantly fewer premium cable services subscribers than Time Warner. Indeed, for all services combined, Plaintiffs allege that U-Verse and FiOS had a total of 2.06 and 2.9 million customers, respectively. The next three largest competitors, Plaintiffs allege, had a combined customer base of less than 900,000 customers, while several others ceased operations or declared bankruptcy. These allegations are sufficient to plausibly allege that Time Warner has market power

9

over premium cable services. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (explaining that market power may be shown directly, by evidence of the ability to control prices or exclude competition, or indirectly, by evidence of high market share and other relevant market characteristics, such as strength of the competition, barriers to entry, and elasticity of consumer demand). *See also U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620 (1977) (identifying relevant inquiry into market power as "whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market").

As to the majority's second point, concerning market share in relevant geographic markets, the mere possibility of regional variations in Time Warner's market share does not defeat Plaintiffs' claim. "In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim. If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power." *Todd v. Exxon Corp.*, 275 F.3d 191, 206–07 (2d Cir. 2001) (internal citation and quotation marks omitted). Here, Plaintiffs allege that Time Warner faces no competition in at least

10

31 geographic markets.[3] As for the remaining 22 markets, Plaintiffs allege that Time Warner faces minimal competition. Specifically, Plaintiffs allege that U-verse and FiOS—Time Warner's largest competitors—provide services to approximately 500,000 subscribers each within geographic markets controlled by Time Warner. And, as discussed above, Time Warner's other competitors face significant barriers to entry, and represent a total combined customer base of less than 900,000. These numbers contrast with Time Warner's total Premium Cable customer base of 8.9 million, and support the inference that Time Warner possesses sufficient market power across all relevant markets. Requiring a greater degree of specificity from Plaintiffs would be inconsistent with this Court's extensive precedent to the contrary. *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120–21 (2d Cir. 2010) (rejecting argument that *Iqbal* "require[s] the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (2d Cir. 2009) (reiterating that "it is sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled give the defendant fair notice of

---

[3] Given the overlapping nature of cable services, the precise number of distinct geographic markets at issue is difficult to discern. For simplicity's sake, I use the same numbers adopted by the majority.

what the claim is and the grounds upon which it rests" (internal quotation marks omitted)).

*    *    *

"The role of the court at this stage of the proceedings is not in any way to evaluate the truth . . . but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, Nos. 15-1536 (Lead), 15-1661 (XAP), 2016 WL 4056034, at \*9 (2d Cir. July 29, 2016). I cannot conclude, as the majority does, that Plaintiffs' allegations as to product markets and market power, which support their tying claim, are insufficient "to allow the case to proceed." For these reasons, I respectfully dissent.