**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 19, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

In re:  COX ENTERPRISES, INC. SET-
TOP CABLE TELEVISION BOX
ANTITRUST LITIGATION

------------------------------

RICHARD HEALY,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

COX COMMUNICATIONS, INC.,

      Defendant - Appellee/Cross-
      Appellant.

Nos. 15-6218 & 15-6222

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:12-ML-02048-C)**
_____

Todd M. Schneider (Jason H. Kim and Kyle G. Bates Schneider Wallace Cottrell
Konecky Wotkyns, LLP, Emeryville, California, Rachel Lawrence Mor, Rachel
Lawrence Mor, P.C., Oklahoma City, Oklahoma, Michael J. Blaschke, Michael J.
Blaschke, P.C., Oklahoma City, Oklahoma, S. Randall Sullivan, Randall Sullivan, P.C.,
Oklahoma City, Oklahoma, A. Daniel Woska, WoskaLawFirm, PLLC, Oklahoma City,
Oklahoma, Allan Kanner and Cynthia St. Amant, Kanner & Whiteley, LLC, New
Orleans, Louisiana, Garrett W. Wotkyns, Schneider Wallace Cottrell Konecky Wotkyns,
LLP, Scottsdale, Arizona, Joe R. Whatley, Jr., Whatley Kallas, LLP, New York, New
York, W. Tucker Brown, Whatley Kallas, LLP, Birmingham, Alabama, Henry C.
Quillen, Whatley Kallas, LLP, Portsmouth, New Hampshire, with him on the briefs),
Schneider Wallace Cottrell Konecky Wotkyns, LLP, Emeryville, California, for Plaintiff-
Appellant/Cross-Appellee.

Margaret M. Zwisler (J. Scott Ballenger, Jennifer L. Giordano, Andrew J. Robinson, Latham & Watkins LLP, Washington, D.C., Alfred C. Pfeiffer, Jr., Latham & Watkins LLP, San Francisco, California, and D. Kent Meyers, Crowe & Dunlevy, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee/Cross-Appellant.

———————————————

Before **BRISCOE**, **EBEL**, and **PHILLIPS**, Circuit Judges.

———————————————

**PHILLIPS**, Circuit Judge.

———————————————

Cox Cable subscribers cannot access premium cable services—features such as interactive program guides, pay-per-view programming, and recording or rewinding capabilities—unless they also rent a set-top box from Cox. Dissatisfied with this arrangement, a class of plaintiffs in Oklahoma City ("Plaintiffs") sued Cox under the antitrust laws. They alleged that Cox had illegally tied cable services to set-top-box rentals in violation of § 1 of the Sherman Act, which prohibits illegal restraints of trade. *See* 15 U.S.C. § 1.

Though a jury found that Plaintiffs had proved the necessary elements to establish a tying arrangement, the district court disagreed. In granting Cox's Fed. R. Civ. P. 50(b) motion, the court determined that Plaintiffs had offered insufficient evidence for a jury to find that Cox's tying arrangement "foreclosed a substantial volume of commerce in Oklahoma City to other sellers or potential sellers of set-top boxes in the market for set-top boxes." *Healy v. Cox Commc'ns, Inc.* (*In re Cox Enters., Inc. Set-Top Cable*

*Television Box Antitrust Litig.*), No. 12–ML–2048–C, 2015 WL 7076418, *1 (W.D. Okla. Nov. 12, 2015).[1]

In assessing the district court's ruling, we first examine how the Supreme Court's treatment of tying arrangements has evolved. Next, we turn to how we and other circuit courts have applied this precedent and how tying law has evolved in the circuit courts. Finally, we analyze the district court's assessment of what the evidence showed in light of the evolving state of the law. Ultimately, we agree with the district court that Plaintiffs failed to show that Cox's tying arrangement foreclosed a substantial volume of commerce in the tied-product market, and therefore the tie did not merit per se condemnation. Because we agree with the district court on the foreclosure element, we affirm.

---

[1] The district court also concluded that Plaintiffs had failed to show anticompetitive injury, meaning that Plaintiffs' evidence was insufficient for the jury to conclude "that loss or injury arose from the competition-reducing aspect of [Cox's] behavior." *In re Cox Enters.*, 2015 WL 7076418, at *2. On appeal, the parties dispute whether Plaintiffs needed to show antitrust injury, which we have defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005) (quoting *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962 n.15 (10th Cir. 1990)). We need not reach that question, however, because we agree with the district court that Plaintiffs failed to meet their burden to show that Cox foreclosed a substantial amount of competition, the fourth element of a per se tying claim.

Similarly, because we affirm the district court, we decline to address the issues that Cox raises in its cross-appeal. Specifically, Cox asked us to review Plaintiffs' failure to define a viable tying product, the proper geographic market for the tying product, and a valid theory of damages, as well as Plaintiffs' failure to address the impact of the National Cooperative Research and Production Act, whether certain class members should have been excluded from the claim, whether the "verdict in this case provides a permissible basis for awarding damages to the individual class members," and whether we must remand for a new trial "because the jury instructions did not accurately convey the essential elements of a tying claim." Appellee's Response Br. at 4.

**DISCUSSION**

## I.      Standard of Review

We review de novo a district court's ruling on a Rule 50(b) motion, drawing all reasonable inferences in favor of the nonmoving party and applying the same standard as applied in the district court. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1023 (10th Cir. 2002). The standard of review for Rule 50 motions "mirrors the standard" for summary-judgment motions under Rule 56(c). *Farthing v. City of Shawnee*, 39 F.3d 1131, 1139 n.10 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Under Rule 50(b), the district court may allow judgment on the jury's verdict, order a new trial, or enter judgment as a matter of law for the moving party. We may grant judgment as a matter of law only when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, "[j]udgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments*, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013)).

## II.      Background

Considering its expansive reach, the Sherman Act contains remarkably little text and hasn't been amended since it was enacted in 1890. Thus, antitrust law's various doctrines are almost entirely judge-made; courts have created these doctrines based on

4

their own interpretations of the Sherman Act's statutory language and background. For this reason, the statute's limited language goes only so far, and theory must fill in the gaps. So to understand how and why tying arrangements came to be condemned by antitrust law, we must dive into their theoretical underpinnings.

A tie exists when a seller exploits its control in one product market to force buyers in a second market into purchasing a tied product that the buyer either didn't want or wanted to purchase elsewhere. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). For example, "[a] supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as the *tied* product." *Id.* at 33 (O'Connor, J., concurring). Courts typically apply a per se rule to tying claims.[2] *See Int'l Salt Co. v. United States*, 332 U.S. 392 (1947), *abrogated on other grounds by Ill. Tool Works Inc.*, 547 U.S. 28. Under a per se rule, plaintiffs prevail simply by proving that a particular contract or business arrangement—in this case, a tie— exists; no further market analysis is necessary, and defendants may not present any defenses. *See* 9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1720a (3d ed.

---

[2] Only some types of antitrust claims receive per se treatment; all others are analyzed using a rule of reason. *See Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 499–500 (1969) (plaintiffs who fail to establish a per se tying violation "can still prevail on the merits whenever [they] can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated"). Under the rule of reason, plaintiffs must prove "the actual effect of the [tying arrangement] on competition." *Jefferson Par.*, 466 U.S. at 29.

2003) ("The paradigmatic per se rule condemns a readily identified practice without proof of power, effect, or intention and without weighing possible justifications.").

Early in the Sherman Act's history, the Supreme Court decided that "tying" two products together disrupted the natural functioning of the markets and violated antitrust law. *See Int'l Salt*, 332 U.S. at 396. It analyzed tying claims under the per se rule: if a plaintiff could show that a tying arrangement existed, the tie was illegal per se. *Id.* But the way courts view ties has evolved substantially since tying arrangements first attracted attention in antitrust law. Thus, today's per se rule against tying is dramatically more nuanced than the typical per se rule. *See* Areeda & Hovenkamp, *supra*, ¶ 1720a (explaining the per se tying rule's multitude of deviations from typical per se rule application). Though the typical antitrust per se rule requires no analysis of market conditions or effects, the Supreme Court has declared that the per se rule for tying arrangements demands a showing that the tie creates "a substantial potential for impact on competition." *Jefferson Par.*, 466 U.S. at 16. Today's plaintiffs must therefore do more than show that a tie exists to trigger the application of the per se rule; they must also meet certain threshold requirements—including that the tie had the substantial potential to harm competition in the market for the tied product.

## III. The Evolution of Tying Law

From the Supreme Court's tying cases, circuit courts have pulled several elements needed to prove per se tying claims, though these elements differ across the circuits. To succeed on a per se tying claim in the Tenth Circuit, a plaintiff must show that "(1) two separate products are involved; (2) the sale or agreement to sell one product is

6

conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017) (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997)).

If a plaintiff fails to prove an element, the court will not apply the per se rule to the tie, but then may choose to analyze the merits of the claim under the rule of reason. *See Fortner Enters, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 500 (1969) (explaining that failure to satisfy per se requirements isn't always fatal to a tying claim and that a plaintiff "can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated"). The fight in this case is over the fourth element. Plaintiffs claim that "this element only requires consideration of the gross volume of commerce affected by the tie," and that they "met this requirement by the undisputed evidence that Cox obtained over $200 million in revenues from renting [set-top boxes] during the class period." Appellants' Opening Br. at 29. In other words, Plaintiffs would have us infer that because Cox makes a substantial amount of money on set-top-box rentals, the tie necessarily has the requisite potential for anticompetitive effects in the set-top-box market. But both Cox and the district court maintain that this element requires a showing that the tie actually foreclosed some amount of commerce, or some current or potential competitor, in the market for set-top boxes.

7

Plaintiffs' argument reflects an outdated view of the law. As we explain below, recent developments in the way courts treat tying arrangements validate the district court's order and support Cox's interpretation of tying law's foreclosure element.

### A.    The Supreme Court's Per Se Rule & the Evolution of Tying Law

Two Supreme Court cases, *Jefferson Parish* and *Fortner Enterprises*, establish that proof of foreclosure is necessary to prove a per se tying claim. But when the Supreme Court first addressed tying arrangements, it concluded that they served "hardly any purpose beyond the suppression of competition." *E.g.*, *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 305 (1949). At that time, the Court placed tying arrangements in the class of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Still, even at this early juncture, the Court seemed to recognize that, unlike price-fixing and market division between competitors, "there is nothing inherently anticompetitive about packaged sales." *Jefferson Par.*, 466 U.S. at 25. So, without claiming to modify its per se rule, the Supreme Court stated that tying arrangements are "unreasonable in and of themselves," but only "when[] a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Fortner Enters.*, 394 U.S. at 499 (quoting *N. Pac. Ry. Co.*, 356 U.S. at 6).

8

This case primarily concerns the foreclosure element of tying claims, which stems from *Fortner*. In *Fortner*, the Supreme Court stated that "[t]he requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie." 394 U.S. at 501. But the Court then clarified that "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie." *Id.* To reach this holding, the Court relied on an earlier case in which it stated that "it is 'unreasonable, per se, to foreclose competitors from any substantial market' by a tying arrangement." *Id.* (quoting *Int'l Salt*, 332 U.S. at 396).

After *Fortner*, the Court again addressed tying claims in *Jefferson Parish*. There, the Court modified its view of tying arrangements. It explained that the rule prohibiting ties aims to prevent sellers from using their power in one market to gain control in a separate market. 466 U.S. at 12. It also emphasized that antitrust law protects competition, not competitors or even consumer choice or price. *Id.* at 14–15. As the Court stated,

> [T]he law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market . . . the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product, and can increase the social costs of market power by

9

facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie.

*Id.* (footnote and citations omitted); *see also* Areeda & Hovenkamp, *supra*, ¶ 1726c ("Interference with customer choice is not itself the concern of tying law; rather, the relevant interference is the one that results from an *anticompetitive effect in the tied market*—namely, from the threat of increased concentration, higher prices, or perhaps an increase in the social costs of preexisting power in the tying market."). Thus, the Court realized "that every refusal to sell two products separately cannot be said to restrain competition." *Jefferson Par.*, 466 U.S. at 11.

Attempting to screen out tying arrangements that posed no danger to competition, the *Jefferson Parish* Court enumerated several threshold requirements necessary to trigger application of the per se rule against tying. From these requirements, circuit courts have shaped the elements required for per se claims. These requirements included a seller's power in the tying market, the tying of two distinct products, and, most importantly for our purposes, the likelihood of anticompetitive conduct. *Id.* at 15–16. Discretely amending its approach from previous cases such as *Fortner* and *International Salt*, the Court also required as a threshold matter a "substantial potential for impact on competition" before it would apply its per se rule to a tying arrangement. *Id.* at 16. Even though the Court said that "[t]he rationale for per se rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at

bar involves anticompetitive conduct," it simultaneously "refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby." *Id.* at 15 n.25, 16. It went on to explain that "[o]nce this threshold is surmounted, per se prohibition is appropriate *if* anticompetitive forcing is likely." *Id.* at 16 (emphasis added). So, not only must plaintiffs demonstrate the existence of certain threshold conditions, they must also show that anticompetitive forcing is likely because of the tie. In this way, the Court acknowledged that some ties have little or no potential to harm competition, and therefore shouldn't trigger the per se rule.

So, as outlined above, *Jefferson Parish* modified *Fortner*. And most recently, the Supreme Court modified the law even further by prohibiting courts from inferring market power over the tying product from a seller's patent on that product. *Ill. Tool Works Inc.*, 547 U.S. at 31. Though that decision isn't factually relevant to our case and bears on a different element, it signifies that "[o]ver the years, . . . [the Supreme] Court's strong disapproval of tying arrangements has substantially diminished." *Id.* at 35. This attitude is on display in *Jefferson Parish*, where the Court stated without qualification that "we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby." 466 U.S. at 16.

So, even if tying plaintiffs show that a tie affected a substantial dollar volume of sales, they must still show that the tie meets *Jefferson Parish*'s threshold requirements to trigger the per se rule. In other words, the tying arrangement must be the type of tie that could potentially harm competition in the tied-product market. If "no portion of the market which would otherwise have been available to other sellers has been foreclosed,"

11

then no amount of tied sales could cross the threshold to per se condemnation. *Id.*;

Areeda & Hovenkamp, *supra*, ¶ 1721d (explaining that if there are no rival sellers of the

tied product or if the buyer would not have bought the tied product even from a different

seller, then, "[n]otwithstanding a substantial dollar volume of sales . . . the foreclosure is

zero and therefore fails to cross the per se 'threshold.'" (quoting *Jefferson Par.*, 466 U.S.

at 16)). Thus, though the per se rule against tying doesn't require an exhaustive analysis

into a tie's anticompetitive effects in the tied product market, the rule "can be coherent

only if tying is defined by reference to the economic effect of the arrangement." *Jefferson

Par.*, 466 U.S. at 21 n.33.

## B.     Per Se Tying Law in Other Circuit Courts

Circuit courts have undergone a similar theoretical shift. They first picked up on

the peculiar nature of tying claims in *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286,

1292 (2d Cir.), *cert. denied*, 419 U.S. 1022 (1974). *See* Areeda & Hovenkamp, *supra*,

¶ 1722b. In that case, the Second Circuit began explicitly requiring "anticompetitive

effect[s]" as an element of a per se tying claim. *Coniglio*, 495 F.2d at 1292. The plaintiff

complained that the Buffalo Bills forced fans to buy tickets to exhibition games along

with regular-season home games in season-ticket packages, and that he had no interest in

going to the exhibition games. *Id.* at 1288–89. Without declaring that it was creating a

new requirement for tying claims, the court announced that the plaintiff's claim failed

because he couldn't show any anticompetitive effects in the tied-product market. *Id.*

at 1291–92. Because the Buffalo Bills necessarily had a monopoly over regular-season

games as well as exhibition games, "there were neither actual nor potential competitors to

the Bills in the professional football market." *Id.* at 1291 (footnote omitted). Thus, noting that the plaintiff had completely failed "to demonstrate any adverse effect on competition, actual or potential," the court affirmed the district court's grant of summary judgment to Highwood Services (the owner and operator of the Buffalo Bills). *Id.* at 1293.

Other circuits have since taken up this mantle—some have done so explicitly and others implicitly. *See* Areeda & Hovenkamp, *supra*, ¶ 1722a (listing circuits requiring anticompetitive effects to succeed on tying claims). The Fifth Circuit explicitly required *Coniglio*'s anticompetitive effects in *Driskill v. Dallas Cowboys Football Club*, *Inc.*, 498 F.2d 321, 323 (5th Cir. 1974), in which a Dallas Cowboys fan brought the exact same claim as the plaintiff in *Coniglio*. The Eleventh Circuit then cited *Driskill* in granting summary judgment to a condominium vendor that required condominium buyers to lease individual interest in common areas. *Commodore Plaza at Century 21 Condo. Ass'n v. Saul J. Morgan Enters., Inc.*, 746 F.2d 671, 672 (11th Cir.), *cert. denied*, 467 U.S. 1241 (1984). The court stated, "In this case, as in *Driskill*, the plaintiffs failed to make any showing of coercion or anticompetitive effects." *Id.*

Building on this growing trend, the First Circuit has stated that tying claims "must fail absent any proof of anti-competitive effects in the market for the tied product." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 815 (1st Cir.), *cert. denied*, 488 U.S. 955 (1988). The court moderated this holding, stating that plaintiffs need not prove "the actual scope of anti-competitive effects in the market," but ultimately adopted *Jefferson Parish*'s reasoning in stating that "as a matter of practical inferential

13

common sense," the plaintiff had to "make some minimal showing of real or potential foreclosed commerce caused by the tie." *Id.* at 815 n.11.

Similarly, the Seventh Circuit has declined to apply the per se rule to condemn ties that pose no danger to competition. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821 (7th Cir.), *cert. denied*, 440 U.S. 930 (1978). In *Ohio-Sealy*, the court acknowledged that it was "not free to inquire whether such tying in any given case injures market competition," but still stated that "if a given tying arrangement has no potential to foreclose access to the tied product market, it does not exemplify the vice that led the [Supreme] Court to declare tying a [p]er se [o]ffense." *Id.* at 835.

So, like the Supreme Court, the circuit courts generally recognize that a tie should not be condemned under the per se rule unless it has the potential to harm competition.

## C.    Per Se Tying Claims in the Tenth Circuit

Similarly, we have acknowledged that even under a per se rule, we must at least make a threshold determination of potential harm to competition before we can condemn a tying arrangement under the Sherman Act. In *Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 955 (10th Cir. 1986), we integrated this caveat to the per se rule into the fourth element of a per se tying claim. There, a company that imported Mazda cars and distributed them to car dealerships refused to sell the dealerships a popular car model, the RX-7, unless the dealers sold a sufficient amount of the less-popular car model, the GLC. *Id.* at 955–56. The dealerships sued, alleging that the distributor's allocation method constituted a per se illegal tie under § 1 of the Sherman Act. *Id.* at 956. While acknowledging that the Supreme Court has deemed certain tying

14

arrangements illegal per se, we specified that tying arrangements pose no risk of foreclosing competition in the tied-product market unless certain elements are present. *See id.* at 957.

Specifically, we held that tying arrangements must "foreclose *to competitors* of the tied market a 'not insubstantial' volume of commerce." *Id.* at 957 (emphasis added) (quoting *Fortner*, 394 U.S. at 499). In *Fox Motors*, "[t]he record contain[ed] no indication that the alleged tying arrangement, as distinct from consumer demand, influenced the level" of competition in the tied-product market. *Id.* at 958. Therefore, even though proof of anticompetitive effects was not an explicit element of tying claims in the Tenth Circuit, we still concluded that the tying arrangement "simply [did] not imply a sufficiently great likelihood of anticompetitive effect." *Id.* Because the tie failed to foreclose any competing car manufacturers, it didn't meet *Jefferson Parish*'s threshold requirements for per se treatment. *Id.* Thus, we incorporated proof of actual or likely anticompetitive effect into the foreclosure element of tying claims. In doing so, we heeded *Jefferson Parish*'s warning that some tying arrangements simply don't pose the same level of risk as those behaviors whose potential to harm competition is so pronounced as to deserve per se condemnation without regard to their actual impact on the market.

### D.    Per Se Tying Law & Technology

Courts have also acknowledged that some industries or products are sufficiently distinct that per se treatment is inappropriate. This is especially true in the world of

15

technology, where courts are often unfamiliar with the products and market structure, and thus can't be certain of the potential for anticompetitive effects.

> *Per se* rules of antitrust illegality are reserved for those situations where logic and experience show that the risk of injury to competition from the defendant's behavior is so pronounced that it is needless and wasteful to conduct the usual judicial inquiry into the balance between the behavior's procompetitive benefits and its anticompetitive costs.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 486–87 (1992) (Scalia, J., dissenting). The D.C. Circuit applied this principle in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001). Though the factual circumstances of that case are quite different from our own, we find the D.C. Circuit's reliance on *Eastman Kodak* and *Jefferson Parish* illuminating. There, the court faced a novel tying arrangement in which Microsoft had integrated the internet web browser, Internet Explorer, into Windows, its computer operating system. *Id.* at 45. Noting that some business relationships "represent entire, novel categories of dealings," the court concluded that "simplistic application of per se tying rules" would be inappropriate. *Id.* at 84. The court acknowledged that tying arrangements can impact buyers' independent judgment in the tied-product market, but it went on to state that when "competitive firms always bundle the tying and tied goods," the tie should not trigger the per se rule. *Id.* at 86. "Indeed, if there were no efficiencies from a tie (including economizing on consumer transaction costs such as the time and effort involved in choice)," consumers would always purchase a product's component parts separately. *Id.* at 87. Thus, because even firms without market power integrated internet web browsers and computer operating systems, and the court was dealing with a

16

relatively novel tying arrangement, the court refused to apply the per se rule to condemn the tying arrangement. *Id.* at 93.

A recent Second Circuit case, *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016), builds on *Microsoft* and is even more relevant to our analysis because it concerns the same tie by a different cable company. Similar to our case, the plaintiffs were a class of Time Warner Cable subscribers who were forced to rent set-top boxes to receive premium cable services. Though tying claims in the Second Circuit differ from ours by explicitly requiring a showing of anticompetitive effects in the tied-product market, the court's analysis in *Kaufman* is still very useful. *See id.* at 141. The court thoroughly explained the technology behind premium cable and set-top boxes and demonstrated why the tying arrangement at issue didn't trigger the application of the per se rule.[3]

To start, the court explained that cable providers sell their subscribers the right to view certain packages of programming. *Id.* at 144. But the content creators—companies like HBO that produce television shows—require the cable companies to prevent viewers from stealing their content. *Id.* Set-top boxes solve this problem—cable providers "code their signals to prevent theft," and cable boxes receive the providers' coded signals and "unscramble" them. *Id.* "Unsurprisingly, providers do not share their codes with cable box manufacturers. . . . Therefore, to be useful to a consumer, a cable box must be cable-provider specific, like the keys to a padlock." *Id.*

---

[3] Though the Second Circuit rejected the plaintiffs' claim because set-top boxes and premium cable services aren't two distinct products, its analysis supports the conclusion we reach here today—namely, that the tie at issue doesn't meet the per se rule's threshold requirements.

17

After explaining the function of set-top boxes, the Second Circuit turned to the regulatory environment and the history of the cable industry's use of set-top boxes. Significantly, the court pointed out that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue" because "the existence of a regulatory structure designed to . . . perform[] the antitrust function" might "diminish[] the likelihood of major antitrust harm." *Id.* at 145 (second and third alterations in original) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411–12 (2004)). The court described the Federal Communication Commission's ("FCC") attempts over the past twenty years to disaggregate set-top boxes from the delivery of premium cable, and stated that the FCC's failure is at least partly attributable to shortcomings in the new technologies designed to make premium cable available without set-top boxes. *See id.* at 146 ("[A] new approach that would work with two-way services [failed because it] was not sophisticated enough to meet content companies' content protection demands." (alterations in original) (quoting Expanding Consumers' Video Navigation Choices; Commercial Availability of Navigational Devices, 81 Fed. Reg. 14,033, 14,033–04 (Mar. 16, 2016))).

The court also pointed out that one FCC regulation actually caps the price that cable providers can charge customers who rent set-top boxes.[4] *See* 47 C.F.R. § 76.923(f)–(g). Under the regulation, cable companies must calculate the cost of making such set-top

---

[4] Neither Healy nor Cox addresses this regulation. Still, it is relevant to the issue at hand because it limits the amount of power Cox can obtain in the tied-product market.

boxes functional and available for consumers, and must charge customers according to those costs, including only a "reasonable profit" in their leasing rates. *Id.* § 76.923(c). The Second Circuit ultimately concluded that the plaintiffs' factual allegations against Time Warner couldn't survive summary judgment because they didn't trigger the application of the per se tying rule. *Id.* at 147.

In sum, it is now clear that before applying the per se rule to tying arrangements, courts must carefully analyze the tie to ensure that it meets *Jefferson Parish*'s threshold requirements. If it does not, the court may further analyze the tie using the rule of reason to determine whether it actually harms or threatens to harm competition.[5]

## IV. Analysis

### A. Foreclosure of a Substantial Volume of Commerce

This case comes down to what it means to foreclose a "not insubstantial" volume of commerce. As we discussed, a per se tying claim has four elements, and we have concluded that the fourth element—foreclosure—requires proof of actual or potential anticompetitive effects in the tied-product market. Based on the Supreme Court's tying cases and our own precedent, Plaintiffs failed to show that the tie had the substantial potential to foreclose competition. *See Jefferson Par.*, 466 U.S. at 15–16; *Fox Motors*, 806 F.2d at 957–58.

---

[5] Courts need apply a rule-of-reason analysis to a per se tying claim only if plaintiffs argue that the tie is illegal under the rule of reason as well. *See Fox Motors*, 806 F.2d at 959 n.3 ("Because the challenged allocation system was not unlawful under the per se rule and because plaintiffs have not challenged its legality under the Rule or [sic] Reason, we need not consider whether the evidence of a conspiracy between defendants was sufficient.").

The jury found that Plaintiffs had met their burden of showing that Cox's tie had foreclosed a substantial amount of commerce in the set-top-box market. The jury-verdict form asked, "Has the alleged tying arrangement foreclosed a substantial volume of commerce in the Oklahoma City subsystem to other sellers or potential sellers of set-top boxes in the market for set-top boxes?" Joint App. vol. III at 614. The jury circled "Yes." *Id.* But a careful review of the record in light of post-*Jefferson Parish* law reveals that the record does not support the jury's conclusion. Rather, just as the district court found, Cox's tie didn't foreclose any commerce, nor did it prevent or even discourage other competitors from entering the market. Therefore, Cox's tie didn't meet the foreclosure element's threshold requirements necessary to trigger the per se rule against tying.

## B.      The Jury Instruction Was Correct

Plaintiffs vehemently argue that they presented enough evidence to show that Cox's tie affected a substantial volume of commerce. But before we can reach the evidence, we must address Plaintiffs' claim that the law and the foreclosure-of-commerce jury instruction required them to show only that Cox's set-top-box rental proceeds yielded more than a de minimis dollar amount. Plaintiffs argue that to satisfy this element of their claim, the jury instructions properly required them to show only that Cox's set-top-box rental profits were more than de mimimis. They claim that neither the jury instruction nor the law required any further proof for them to meet their burden on this issue. Their argument fails because it emphasizes one line of the jury instruction at the expense of the remainder. When read as a whole, the jury instruction implements the overall goals of tying law and *Jefferson Parish*'s threshold requirements.

20

The jury instruction on the foreclosure-of-commerce element, Jury Instruction 19, contained two paragraphs:

> The fourth element that Plaintiff[s] must prove is whether, during the class period, [Cox] has foreclosed a substantial amount of commerce *to other sellers or potential sellers* of set-top boxes in the market for set-top boxes. This occurs *when the tying of two products either prevents competitors from selling the tied product* or limits the choice available to consumers in the purchase of the tied product.
>
> In determining whether [Cox] has foreclosed a substantial amount of commerce in the relevant market for set-top boxes, you should first consider the total dollar amount of [Cox's] leases of set-top boxes in Oklahoma City *achieved by the tying arrangement* in absolute terms. If the dollar amount of [Cox's] leases of set-top boxes was substantial, then you should find that [Cox] has foreclosed a substantial amount of commerce.

Joint App. vol. III at 601 (emphasis added). Upon Cox's renewed Rule 50(b) motion, the district court concluded that Plaintiffs had failed to prove the foreclosure element of their tying claim because "Plaintiff[s] failed to offer evidence from which a jury could determine that any other manufacturer wished to sell set-top boxes at retail or that Cox had acted in a manner to prevent any other manufacturer from selling set-top boxes at retail." *In re Cox Enters.*, 2015 WL 7076418, at *1.

Plaintiffs contend that nothing in the jury instructions required them to offer such evidence. Instead, they seize upon the last sentence of the jury instruction, arguing that to prevail on the foreclosure element, they needed to show only that Cox made a substantial amount of money on its set-top-box leases. We acknowledge that reading the last sentence *in isolation* could lead a jury to believe that plaintiffs met the foreclosure element just by showing that the defendant made a substantial amount of money on the

21

tied product. But, though inartfully drawn, the instruction must be read as a whole.[6] And

when doing so, we believe it evident that Plaintiffs' reading—elevating the last sentence

above the rest of the instruction—is incorrect.[7]

In fact, Plaintiffs' interpretation of Jury Instruction 19 would render the entire first

paragraph of the jury instruction meaningless. This paragraph is not merely explanatory;

it defines the fourth element's affirmative requirements. As a threshold matter, it provides

that Plaintiffs must show not only that Cox has foreclosed a substantial volume of

commerce, but that it has foreclosed this commerce "*to* other sellers or potential sellers of

---

[6] A proper reading of the instruction does not cast off earlier requirements just because the instruction does not go to the trouble, and length, to repeat them in every sentence. When the last sentence is read as part of the whole instruction, it gives effect to earlier language, meaning this: "If the dollar amount of [Cox's] leases of set-top boxes [achieved by the tying arrangement] was substantial, then you should find that [Cox] has foreclosed a substantial amount of commerce [to other sellers or potential sellers of set-top boxes in the market for set-top boxes]."

[7] Plaintiffs argue that "[e]ven if . . . the jury instructions were incomplete or incorrect, the remedy is a new trial under correct instructions and not judgment in favor of Cox." Appellants' Response Br. at 23–24. But a new trial with a jury instruction that more clearly explained the foreclosure element wouldn't change the outcome of this case.

As we explained above, the foreclosure element of a per se tying claim in our circuit requires a showing that the tie had the potential to or actually did harm competition in the tied-product market. Having "been fully heard on [the] issue . . . there is no legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiffs]" under the law. Fed. R. Civ. P. 50(a)(1). In other words, the record shows that Cox's tie was not the sole—or even the primary—reason that Plaintiffs couldn't purchase set-top boxes or their alternatives from other manufacturers. *See In re Cox Enters.*, 2015 WL 7076418, at *1 ("Plaintiff[s] failed to offer evidence from which a jury could determine that any other manufacturer wished to sell set-top boxes at retail or that Cox had acted in a manner to prevent any other manufacturer from selling set-top boxes at retail."). Therefore, the tie didn't foreclose competition in the tied-product market and the district court properly granted Cox judgment as a matter of law under Rule 50(b).

22

set-top boxes." Joint App. vol. III at 601 (emphasis added). The paragraph then goes on to explain that in a tying claim, plaintiffs must show that the *tying arrangement* caused the foreclosure—either by preventing new competitors from entering or by driving existing competitors out of the tied-product market.

When read in context, the first paragraph of Jury Instruction 19 restricts the meaning of its last sentence. The dollar amount of Cox's set-top-box leases that is relevant to the foreclosure element must have been achieved by the tie. This is important—the foreclosure must result from the tie itself, not from any other anticompetitive conduct (which would be a different claim altogether), or from any external factors unrelated to the tie. But the total dollar amount of the leases doesn't matter if Cox's tie wasn't the reason its customers leased set-top boxes from Cox. In other words, Jury Instruction 19 properly explains that making money from a tying arrangement doesn't violate § 1 of the Sherman Act unless the defendant, by doing so, has actually or potentially foreclosed or injured competition in the tied-product market.

This interpretation of the jury instruction accords with the Supreme Court's tying-law precedent. *See Jefferson Par.*, 466 U.S. at 15–16 ("Per se condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. Thus, application of the per se rule focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation."). It also accords with our own tying-law precedent. *See Fox Motors*, 806 F.2d at 959 (declining to condemn the alleged tying arrangement because it didn't

foreclose competing manufacturers and therefore "cannot be characterized as a tying arrangement of the kind presumptively condemned under the antitrust laws").

As we discussed above, the question of whether to apply the per se rule to tying claims has become increasingly complex as courts have begun to question whether tying arrangements actually deserve per se condemnation. *See Ill. Tool Works*, 547 U.S. at 35 (noting that "strong disapproval of tying arrangements has substantially diminished"); *Jefferson Par.*, 466 U.S. at 35 (O'Connor, J., concurring) ("The time has . . . come to abandon the 'per se' label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have."). Because tying claims often present little or no potential to harm competition—and thus, no antitrust concerns— plaintiffs alleging per se unlawful tying arrangements must do more to meet the foreclosure element than point to a dollar amount. *See Jefferson Par.*, 466 U.S. at 15–16. They must show that the alleged tying arrangement had the potential to or actually did injure competition. Thus, even before we reach the application of the per se rule, the plaintiffs must show that this is the type of tie that threatens to harm competition such that it deserves per se treatment. Here, the jury instruction properly required the Plaintiffs to do so, and the Plaintiffs failed to meet their burden.

### C.    Plaintiffs Failed to Show Foreclosure

Turning to the district court's order granting Cox's Rule 50(b) motion, the district court found that Cox hadn't foreclosed any commerce because, through no fault of Cox's, no manufacturers sold or even wanted to sell set-top boxes directly to consumers. *In re Cox Enters.*, 2015 WL 7076418, at \*1. Plaintiffs argue that they presented more than

24

enough evidence to show that the lack of competition in the set-top-box market resulted from Cox's tying arrangement. We acknowledge that we must not disregard the jury's verdict. But in light of our analysis of the foreclosure element, we agree with the district court that Plaintiffs failed to present evidence sufficient to show that Cox's alleged tie foreclosed a substantial volume of commerce in the market for set-top boxes. In other words, "the evidence points but one way and is susceptible to no reasonable inferences which may support [Plaintiffs'] position." *Auraria Student Hous.*, 843 F.3d at 1247 (quoting *Elm Ridge Expl. Co.*, 721 F.3d at 1216). We therefore conclude that the tie did not trigger the application of the per se rule.

Similar to *Fox Motors* and *Microsoft*, our case simply doesn't merit per se condemnation. Four factors support our conclusion. First, Cox was an intermediary between set-top-box manufacturers and cable customers. Second, Cox had no competitors in the set-top-box market. Third, all cable companies similarly tie premium cable services to set-top-box rentals, suggesting that net efficiencies and technological constraints—rather than desire to gain monopoly power in the tied-product market—necessitated the tie. Finally, the FCC's regulatory involvement in set-top boxes further diminishes the possibility that Cox's tie could harm competition in that market.

We begin with the significant fact that Cox does not manufacture the set-top boxes that it rents to customers. On appeal, Plaintiffs completely failed to address this unique market structure. Cox acts as an intermediary between the set-top-box manufacturers and the consumers that use them. That Cox purchases the boxes from manufacturers—and does not make the boxes itself—means that what it later does with the boxes has little or

25

no effect on competition between set-top-box manufacturers in the set-top-box market. *See* Areeda & Hovenkamp, *supra*, ¶ 1709e4 (when sellers simply buy a product from existing manufacturers and resell them to tied customers at a profit, "the tie neither limits the marketing opportunities of the several manufacturers of the second product nor impairs the vitality of competition in their market. Each of those manufacturers remains free to compete for the patronage or blessing of the tying defendant . . . .").

In fact, competition in the set-top-box market might continue to be robust because set-top-box manufacturers must continue to innovate and compete with each other to maintain their status as the preferred manufacturer for as many cable companies as possible. *Id.* As a prominent antitrust scholar has noted, "a foreclosure is of doubtful significance when the tying seller does not make the tied product but merely purchases it from independent suppliers," *id.* ¶ 1709a, because "[a] tie cannot bring the defendant power in a market that it does not inhabit. . . . [S]uch a defendant does not itself 'invade' or 'dominate' the market for the tied product," *id.* ¶ 1726d1 (citing *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985); *Ohio-Sealy*, 585 F.2d at 834–35).

Though the risk of foreclosing competition increases when the seller's customers—here, Cox's premium cable subscribers—are the only purchasers of the tied product, the risk is offset in this case because if they chose to, set-top-box manufacturers could sell their wares directly to cable customers. But none do. If enough customers demanded to buy set-top boxes or set-top-box alternatives directly from manufacturers, the manufacturers could have chosen to sell them directly; Cox's tie did not preclude

26

them from doing so. In fact, Cox presented testimony from the executives of several set-top-box manufacturers confirming that Cox had no impact on their decisions not to sell set-top boxes at retail or directly to consumers.

Second, that no manufacturers chose to sell their products to consumers, either directly or at retail, means that Cox has no existing rivals in the set-top-box market (as the district court pointed out). Though Plaintiffs maintain that they don't need to prove the existence of any competitors in the tied-product market, they allege that Cox's tie likely caused the lack of competitors in the set-top-box market. Even if Cox had created an effective tie—and it very well might have done so—the lack of competitors in the set-top-box market doesn't prove that the tie foreclosed commerce or harmed competition in that market.

Plaintiffs alternatively argue that numerous actual and potential competitors existed in the retail market for set-top boxes. To support their claim, Plaintiffs point to evidence that many manufacturers were certified to offer CableCard-enabled products at retail. But in doing so, Plaintiffs again ignore that representatives of these manufacturers testified that they chose not to sell their set-top boxes at retail for reasons unrelated to Cox's tie. Plaintiffs also argue that TiVo wanted to sell a set-top box at retail but couldn't move forward with this plan due to a falsely manufactured "indemnification issue" on Cox's part. Appellant's Opening Br. at 25.

But contrary to Plaintiffs' contention, the record suggests instead that both Cox and TiVo thought their first attempt at TiVo boxes that integrated Cox's premium cable services operated too slowly to offer to customers, and that after the indemnification issue

27

stalled their second project (which was not close to completion in any case), Cox and TiVo moved on to a third initiative to continue trying to make TiVo's box compatible with Cox's premium cable services. Finally, Plaintiffs point out that many other manufacturers were interested in the set-top-box market, and that a few companies offered Tru2Way products for sale at retail. But Plaintiffs failed to show that Cox's tie, as opposed to consumer choice, defeated these products or kept their manufacturers from selling them.

So here, we have no foreclosure, and zero-foreclosure ties present no antitrust concerns. *See* Areeda & Hovenkamp, *supra*, ¶ 1723a ("When there are no rival sellers of the tied product, then the alleged tie might affect a substantial volume of commerce in the tied product and yet not foreclose anyone."). Because set-top-box manufacturers choose not to sell set-top boxes at retail or directly to consumers, "no rival in the tied market could be foreclosed by" Cox's tie, and therefore "the alleged tie 'does not fall within the realm of contracts "in restraint of trade or commerce" proscribed by Section 1 of the Sherman Act . . . .'" *Id.* ¶ 1723b (quoting *Coniglio*, 495 F.2d at 1292).

Plaintiffs contend that the zero-foreclosure rule applies only where consumers don't want the tied product or where no other seller is capable of selling the tied product for reasons unrelated to the tie. This argument misreads the case law. Though some courts have found that no rival sellers exist when no other sellers are capable of selling the tied product, *see Coniglio*, 495 F.2d at 1291, nowhere did those courts state that this was the *only* occasion where the lack of rival sellers would excuse a tie. Here, the record shows that Cox's tie didn't cause the lack of competitors in the set-top-box market

28

because several manufacturers testified that Cox's actions had no impact on their decision to enter the retail market. This removes the tie from the category of tying claims deserving per se condemnation.

Third, as the D.C. Circuit found so significant in *Microsoft*, all cable companies rent set-top boxes to consumers. *See Microsoft*, 253 F.3d at 86; *see also Kaufman*, 836 F.3d at 144 ("[T]he Complaint lacks any allegation that there have ever been separate sales of set-top boxes and cable services . . . in the United States, even in markets where cable providers face competition . . . ."). This suggests that tying set-top-box rentals to premium cable is simply more efficient than offering them separately. *Microsoft*, 253 F.3d at 88 ("[B]undling by all competitive firms implies strong net efficiencies."); *see also* Areeda & Hovenkamp, *supra*, ¶ 1729e2 ("[T]he most likely inference to be drawn from similar ties imposed by each firm in a market, whether concentrated or unconcentrated, is that competition rather than oligopoly has forced the tie."). Here, technology requirements dictate that consumers rent or buy set-top boxes to receive all of Cox's services. *See Kaufman*, 836 F.3d at 144 ("A cable box must be designed to receive the signal from a particular provider, which requires the provider's cooperation. And because providers code their signals to prevent theft, a cable box must also be able to unscramble the coded signal of the particular provider."). Plaintiffs point out that efficiency and technology aren't the only reasons for Cox's tying arrangement, because cable companies make a hefty profit on set-top-box rentals. But the mere fact that Cox profited from set-top-box rentals doesn't justify applying the per se rule. *See Carl Sandburg*, 758 F.2d at 208 ("[P]laintiff does not establish the requisite economic interest

29

in the tied product market merely by alleging that the tying seller is receiving a profit from the transaction as a whole."). Tying law is concerned with protecting competition; "high prices standing alone are not the evil that antitrust tying law condemns." Areeda & Hovenkamp, *supra*, ¶ 1724a.

Still, Plaintiffs also suggest that this profit-making potential drove Cox to propagate its tie by refusing to support technologies that allowed or would allow customers to access Cox's services without renting set-top boxes from Cox. Even if such support was required,[8] the record simply fails to show that Cox withheld that support. Cox submitted abundant evidence that it supported both CableCard and Tru2Way technologies.[9]

Plaintiffs don't contest that evidence; they simply say that Cox's efforts to open the set-top-box market to other competitors were insufficient. They claim that Cox didn't do enough to inform its customers that it would support CableCard and Tru2Way. Assuming that this evidence is even relevant to whether Cox's tie foreclosed competition in the set-top-box market, Plaintiffs' argument fails. They argue that Cox sabotaged

---

[8] Such support is not required. *See Kaufman*, 836 F.3d at 144 ("[T]he core issue is a cable provider's right to refuse to enable cable boxes it does not control to unscramble its coded signal.").

[9] The former enabled Cox customers to receive one-way services without a set-top box, and the latter enabled them to receive two-way services without a set-top box. Importantly, though, both technologies still required additional hardware to work. The customer would need a CableCard- or Tru2Way-enabled television or a TiVo box to avoid having to purchase or rent a set-top box. As explained above, this functionality strongly indicates a need for the tie that is separate from Cox's desire to profit from set-top-box rentals.

CableCard by not planning any "proactive marketing initiatives" to promote it. Appellant's Opening Br. at 19 (internal citation and quotation marks omitted). But Cox had no obligation to promote CableCard, and when customers chose to use that technology, Cox did nothing to stop them. *See Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009) ("The Sherman Act does not force [a business] to assist a competitor in eating away its own customer base . . .."). Cox's communication to customers that they couldn't access interactive cable services without renting a set-top box was simply a true statement based on the technological limitations of CableCard. Until Tru2Way was ready for release, the only interactive cable service available to Cox customers without a set-top box was pay-per-view, which customers could obtain by phone.[10]

Moreover, when Tru2Way became available, Cox told customers in its annual notice that it was preparing to support, and then in a later notice that it *did* support, the technology. Plaintiffs fault Cox for hiding that information in brochures that no one reads, but we decline to hold Cox liable under the Sherman Act simply because customers failed to read Cox's annual published statements. Moreover, Cox has no duty to support new technology by affirmatively pushing it on consumers. *See Christy Sports*,

---

[10] Whether Cox should have required its sales force to explain to each customer exactly what was available with a set-top box versus CableCard technology is a different question that is irrelevant to whether the tie foreclosed a substantial amount of commerce. Cox supported the CableCard and Tru2Way technologies, meaning that it spent money to make its systems compatible with both technologies. When asked, Cox sales representatives accurately told customers what they could obtain by using CableCard.

555 F.3d at 1197. Accepting that the CableCard and Tru2Way technologies—along with the televisions or TiVo boxes customers needed to use those technologies—qualified as substitutes for set-top boxes, we still could not say that Cox's tie had any detrimental effect on their vitality. Consumers were free to pursue those technologies instead of renting set-top boxes from Cox, but even the FCC concluded that they failed for reasons unrelated to cable companies' tying arrangements. *See* 81 Fed. Reg. at 14,033.

Plaintiffs also point to evidence that Cox refused to support one customer who had purchased a set-top box on eBay. Their argument assumes that in doing so, Cox foreclosed what could have been a thriving, second-hand set-top-box market by refusing to provide cable to customers who purchased their set-top boxes from such marketplaces. We agree with Plaintiffs that this refusal implicates the concern of tying law: that by refusing to support a customer who actually *did* purchase a set-top box from someone other than Cox, the cable company used its monopoly power in the premier cable market to foreclose competition in the set-top-box market. But Cox, in turn, presented compelling evidence justifying its refusal. Based on Cox's experience and knowledge, no set-top box manufacturers sold their wares directly to consumers, so it surmised that a customer had rented this set-top box from some other cable company and, instead of returning it, sold it on eBay. Therefore, for reasons other than the tie, Cox justifiably refused to enable the set-top box to decode its protected content.

32

Fourth, the regulatory environment of the cable industry precludes the possibility that Cox could harm competition with its tie.[11] We agree with the Second Circuit that the "regulatory price control on the *tied* product makes the plaintiffs' tying claim implausible as a whole." *Kaufman*, 836 F.3d at 146. After all, the regulatory cap on the profits that cable companies can procure in the set-top-box market diminishes the already-low likelihood that Cox is attempting to or could possibly obtain monopoly power in the set-top-box market. Moreover, cable companies' obligation to protect the content they provide to their viewers justifies their refusal to enable set-top-box manufacturers to decode such content. As Cox pointed out, cable providers are accountable to content creators to protect such content; thus, their tie serves a functional purpose. Because "as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation," *Jefferson Par.*, 466 U.S. at 16, the tie in this case doesn't trigger the application of tying's per se rule. *See Kaufman*, 836 F.3d at 147 ("The insufficiency of the allegations of a separate market for bidirectional cable boxes, the inability of the FCC to create such a market, and the price regulation of the tied product further persuade us that the Complaint does not plead a plausible tying claim.").

---

[11] Plaintiffs point out that Congress passed the 1996 Telecommunication Act to "assure the commercial availability, to consumers . . . of . . . equipment used . . . to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailers, and other vendors not affiliated with any multichannel video programming distributor." Appellants' Opening Br. at 15 (quoting 47 U.S.C. § 549). But this law does nothing to help their cause. As Plaintiffs explain, this law led to the development of CableCard and Tru2Way, which both failed for technological reasons. *Kaufman*, 836 F.3d at 146.

Plaintiffs do not contest the goals of antitrust tying law. Indeed, the fatal flaw in their argument is that it elevates form over function and fails to acknowledge the reasoning behind the Supreme Court's threshold requirements for triggering the per se rule against tying. Instead of explaining why the tie is dangerous despite Cox's lack of competitors in the set-top-box market, Plaintiffs insist that they need to show only that set-top-box rentals accounted for a substantial dollar amount. They insist that the "tying arrangement[] [is] illegal in and of [itself], without any requirement that the plaintiff make a showing of unreasonable competitive effect." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir. 1983), *overruling recognized by Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653 (9th Cir. 1997). They urge that we must presume anticompetitive effects based on nothing more than the dollar amount of Cox's set-top-box sales. *See Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984).

But as thoroughly discussed above, "the Supreme Court has continued to add more real-market analysis to the requirements of a per se tying claim." *Suture Express*, 851 F.3d at 1038. In doing so, it has informed us that not all ties threaten to harm competition such that they must be declared illegal per se. And here, Cox's tie has no potential to foreclose competition in the set-top-box market, and therefore fails to meet *Jefferson Parish*'s threshold requirements to trigger the per se rule against tying.[12]

_____

[12] We express no opinion here over whether Plaintiffs could have shown a "contract, combination . . ., or conspiracy, in restraint of trade" under § 1 of the Sherman Act. 15 U.S.C. § 1. Leaving aside testimony from set-top box manufacturers

### D.     Application of the Rule of Reason

Plaintiffs also contend that the district court improperly applied the rule of reason to their claim instead of using a per se analysis. As discussed above, the per se analysis for tying arrangements differs from other types of per se antitrust claims because tying arrangements often pose no risk to competition. Because we conclude this tie falls outside the realm of the traditional per se analysis, the district court rightly refused to condemn Cox's tie as illegal per se. And we don't have to apply the rule of reason unless Plaintiffs also argued that the tie was unlawful under a rule of reason analysis. *See Fox Motors*, 806 F.2d at 959 n.3. Because Plaintiffs argued that tying arrangements must be analyzed under the per se rule, we need not address whether Cox's tie would be illegal under a rule of reason analysis.[13]

### CONCLUSION

For the foregoing reasons, we affirm the district court's order granting Cox judgment as a matter of law under Rule 50(b).

---

that Cox had nothing to do with their decision not to sell directly to consumers, Cox could have engaged in nefarious conduct with other cable companies that diminished competition in the set-top-box market. To protect their profits, cable companies could have banded together to dissuade manufacturers from selling set-top boxes at retail. But Plaintiffs don't make this claim, nor did they present evidence of any such behavior.

[13] Still, we note that Plaintiffs' claim would likely have failed either way. Because their claim failed under the more plaintiff-friendly per se analysis, it would also likely fail under the more demanding rule-of-reason analysis. *See* Areeda & Hovenkamp, *supra*, ¶ 1726f (explaining that when a seller purchases the tied product from a third party, "the very doubt that ousted per se treatment also makes it unlikely that an alleged tie of this character will be found to be unreasonable").

Nos. 15-6218, 15-6222, <u>Healy et al. v. Cox Communications, Inc.</u>
**BRISCOE**, Circuit Judge, dissenting.

After a nine-day jury trial in this antitrust case, the district court instructed the jury as to the elements of a per se tying claim. Those instructions correctly stated the law. The jury found for plaintiffs on each element and awarded $6.313 million in damages to the plaintiffs. The evidence presented at trial was sufficient to support the jury's conclusion on each element. Nevertheless, the district court granted the defendant's renewed motion for judgment as a matter of law, and the majority affirms that decision, vacating the jury's verdict.

I respectfully dissent. I would reverse the grant of judgment as a matter of law and reinstate the jury verdict against the defendant on the issue of liability. Were we to reach the issues raised by defendant in its cross-appeal, I would remand for a new trial as to damages under a package approach instruction.

**I**

According to the Supreme Court, the law is and always has been that "certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable '*per se*.'" <u>Jefferson Par. Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 9 (1984). Of course, "not every refusal to sell two products separately can be said to restrain competition." <u>Id.</u> at 11. Thus, our inquiry is whether the alleged tie is one which merits per se condemnation. In fact, per se claims, by their nature, focus on the character of the alleged anticompetitive conduct, not on the actual market effects that conduct may or may not have

caused. Per se illegal agreements or practices are those that, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal *without elaborate inquiry as to the precise harm they have caused or the business excuse for their use*." N. Pac. R.R. Co. v. United States, 356 U.S. 1, 5 (1958). In cases alleging per se violations of the Sherman Act, unlike general claims that a particular practice unreasonably restrains trade, courts look to the nature of the agreement or practice, not the actual market effects of that conduct. See id.; Jefferson Par., 466 U.S. at 21 ("The definitional question depends on whether the arrangement *may have* the type of competitive consequences addressed by the rule."). If the challenged conduct, by its nature, is of the type that has been declared presumptively illegal, then the inquiry ends; courts need not, and should not consider the actual market effects. NCAA v. Board of Regents, 468 U.S. 85, 103–04 (1984) ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render *unjustified* further examination of the challenged conduct." (emphasis added). In such cases, the harm to competition is presumed. Id. (distinguishing between per se claims and general Sherman Act claims based on "whether the ultimate finding is the product of a *presumption* **or** *actual market analysis*" (emphasis added)).

In Jefferson Parish Jefferson Hospital District Number 2 v. Hyde, 466 U.S. 2 (1984), the Supreme Court stated unequivocally, "[i]t is far too late in the

2

history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'" Jefferson Par., 466 U.S. at 9. This rule has been endorsed by the Court many times since it was "first enunciated in International Salt Co. v. United States, 332 U.S. 392, 396 (1947)," and it "reflects congressional policies underlying the antitrust laws." Jefferson Par., 466 U.S. at 9–11 (citing H.R. Rep. No. 627, 63d Cong., 2d Sess., 10–13 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 6–9 (1914)). Thus, our analysis must focus on the nature of the challenged conduct, not on a market analysis of the actual effects that conduct has had. In a per se tying claim "we must consider whether [defendants] are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their [customers] to accept the tying arrangement."[1] Id. at 18.

---

[1] Despite the majority's assertion that the Court "modified its view of tying arrangements" in Jefferson Parish, Maj. Op. at 9, the elements of a tying claim have always been, and continue to be, as they are stated in Jefferson Parish. See Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 461–62 (1992) ("A tying arrangement . . . violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.'" (quoting Fortner Enters., Inc. v. United States Steel Corp. (Fortner I), 394 U.S. 495, 503 (1969))); Fortner I, 394 U.S. at 499 ("[Tying agreements] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." (quoting Int'l Salt Co. v. United States, 332 U.S. 392, 396 (1947))); N. Pac. R.R. Co., 356 U.S. at 6 (same); Times-Picayune Pub. Co. v. United States, 345 U.S.

3

## A. Separate Products

Our first inquiry is whether the products in question are actually separate products that may be illegally tied. This question has also been framed by the Supreme Court as a question of whether "a substantial volume of commerce is foreclosed" by the tie. Id. at 16 (citing Fortner Enters. v. United States Steel Corp. (Fortner I), 394 U.S. 495, 501–02 (1969); N. Pac. R.R., 356 U.S. at 6–7; Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 608–10 (1953); Int'l Salt, 332 U.S. at 396. More recently the Court described it as "a threshold matter" of whether there is "a substantial potential for impact on competition in order to justify per se condemnation." See Jefferson Par., 466 U.S. at 16.

This threshold question is necessary because "[i]f only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." Id. "Similarly, when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be

---

594, 608–09 (1953) ("When the seller enjoys a *monopolistic position in the market for the 'tying' product*, or if a *substantial volume of commerce in the 'tied' product is restrained*, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is 'unreasonable, per se, to foreclose competitors from any substantial market,' *a tying arrangement is banned by § 1 of the Sherman Act whenever both conditions are met*." (emphasis added)).

4

no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." Id.

According to the Supreme Court, "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." Id. at 19. Courts must determine whether the products are "distinguishable in the eyes of buyers" — whether there is "a sale involving two independent transactions, separately priced and purchased from the buyer's perspective." Id. at 19–20. Courts should consider whether other sellers offer or could offer the products separately, whether customers are charged separately for the two products, and whether the tied product is fungible. Id. at 22–23; id. at 23 n.39 (citing United States v. Jerrold Elecs. Corp., 187 F.Supp. 545 (E.D. Pa. 1960), aff'd, 365 U.S. 567 (1961) (per curiam)). Whether two products or services "are functionally linked . . . is not in itself sufficient" to answer the question. Id. at 19 n.30. The Court "ha[s] often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." Id. (collecting cases). "In fact, in some situations the functional link between the two items may enable the seller to maximize its monopoly return on the tying item as a means of charging a higher rent or purchase price to a larger user of the tying item." Id.

Only once has the Supreme Court held that two products were not separate. "In Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953), the Court held that a tying arrangement was not present because the arrangement did not link two distinct markets for products that were distinguishable in the eyes of buyers." Jefferson Par., 466 U.S. at 19. Specifically, in that case, the Court held that, although two newspapers were separate and distinct from the perspective of readers, that "d[id] not necessarily imply that advertisers bought separate and distinct products when insertions were placed in the [two papers]." Id. at 19 n.31. There was no evidence "that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential." Id. The Court "assume[d], therefore, that the readership 'bought' by advertisers in [one paper] was the selfsame 'product' sold by the [other paper] . . . ." Id. "The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." Id. (quoting Times-Picayune, 345 U.S. at 613–14). The Court concluded, "two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists . . . no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same." Id. (quoting Times-Picayune, 345 U.S. at 613–14). In short, if the tied and tying product

6

markets are in fact the same market, there can be no unlawful tie because the seller is not exploiting its power in one market to coerce buyer behavior in another.

In addition, courts of appeals have found that tying arrangements are not deserving of per se condemnation when no other seller could potentially sell the product. These are cases in which the seller has a natural monopoly over both the tied and tying products. See, e.g., Coniglio v. Highwood Services, Inc., 495 F.2d 1286, 1291–92 (2d Cir. 1974) (concluding there was no illegal tie between tickets to regular season professional football games and tickets to exhibition football games because the seller of tickets had a natural monopoly in both the tying and the tied product markets); Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321, 323 (5th Cir. 1974) (following Coniglio and concluding that "the [seller has] a complete monopoly in the tied market . . . and there can thus be no adverse effect on any competitors, even if a tying scheme exists"); Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir. Ill. Oct. 11, 1978) (citing Coniglio and Driskill for the proposition that when the seller has a complete monopoly in both the tied and tying markets, there can "be no foreclosure of competitive access to the tied market resulting from the tie-in"). In these cases, it is not merely that potential sellers of the tied product were uninterested in selling the tied product due to any number of market realities, but that those potential sellers were incapable of selling the tied product because some other seller

7

already possessed a lawfully obtained monopoly in that market. If the seller has a natural monopoly in both the tying and tied product markets, a tying arrangement cannot harm competition in the tied product market, so there can be no illegal tie.

Similarly, when the tied product is completely unwanted by the buyer such that no market exists for that product, there can be no per se illegal tying arrangement. See, e.g., Blough v. Holland Realty, Inc., 574 F.3d 1084, 1089 (9th Cir. 2009) ("Zero foreclosure exists where the tied product is completely unwanted by the buyer."); Reifert v. S. Cent. Wisconsin MLS Corp., 450 F.3d 312, 323 (7th Cir. 2006) ("Despite Reifert's desire to avoid purchasing a Realtors Association membership, without evidence of competitors in the market for services offered by the Realtors Association, there can be no foreclosure of competition."); Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 815 (1st Cir. 1988) ("Wells has failed to demonstrate the slightest market for membership in real estate boards that might have been affected by the defendants' alleged tying arrangement."); id. at 815 n.11 ("Wells' real error here was in failing to show that there was a 'market' at all for real estate board membership."). These cases dealt with purported ties between a real estate listing service and membership in a realtors' association, Reifert, 450 F.3d at 323; Wells Real Estate, 850 F.2d at 805, or between sale of undeveloped lots and realtor's commission for the sale of those lots, Blough, 574 F.3d at 1088. In these circumstances, the "tied product" was not a separate product at all, but merely an

8

item tacked on by the seller to increase the total price for the primary product.  Id. at 1089–90.  These arrangements have "nothing to do with gaining power in the [tied] market or upsetting competition there."  Id. at 1090 (quoting IX Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1724b, at 270(2004 & Supp. 2009)).  A buyer cannot purchase a realtor's services separate from the purchase of land, and membership in a realtors' association provides no benefits aside from the ability to use the multiple listing service, so the markets for those "products" did not exist.  Instead, the "products" were merely an additional cost included in the desired product or service.  See id.  If the market for the tied product does not exist at all, then competition cannot be harmed in that non-existent market, so there can be no illegal tie.

Although courts have framed this inquiry as several various elements of a tying claim, the essential inquiry is the same:  Has the seller linked two distinct product markets in a way that could impair competition in the tied market?  This is the threshold inquiry described by the Supreme Court in Jefferson Parish.

## B.    Market Power

When two separate products are tied, courts must next consider whether the seller has "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product."  N. Pac. R.R. Co., 356 U.S. at 6.  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to

9

force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Par., 466 U.S. at 12. This is because, when a seller conditions the sale of one commodity on the purchase of another, it "coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." Id. at 12–13. Thus, "when the seller has some special ability — usually called 'market power' — to force a purchaser to do something that he would not do in a competitive market," id. at 13–14, then "'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated," id. at 12.

## C.    Tenth Circuit Case Law

The Supreme Court has instructed us to answer two questions:  First, has the seller linked two separate product markets?  Second, has the seller used its market power in the tying product market to coerce buyer behavior in the tied product market?  Each Circuit, including ours, defines the elements of a tying claim slightly differently.  We have required plaintiffs to show:

> (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a "not insubstantial" amount of interstate commerce in the tied product is affected.

10

Suture Express, Inc. v. Owens & Minor Distrib., 851 F.3d 1029, 1037 (10th Cir. 2017) (quoting Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 886 (10th Cir. 1997)).  In my view, our first, second, and fourth elements address whether two separate product markets have been tied together by the seller such that there is a substantial potential for impact on competition in order to justify per se condemnation; our third element addresses whether the seller has market power in the tying product market sufficient to enable it to coerce buyer behavior in the tied product market.

## II

With that framework in mind, I turn to the evidence presented in this case. Because there is no small amount of disagreement as to what is meant by the Tenth Circuit's expression of the elements, and because the Tenth Circuit's expression of the test is presumptively within the bounds set by the Supreme Court, I will focus on the elements as the Supreme Court has described them.  The evidence presented at trial was sufficient to support a jury finding that Cox linked the otherwise separate product markets for premium cable services[2] and set-top boxes, and that Cox used its market power in the market for premium cable services to coerce its customers into renting set-top boxes from Cox, thereby presumptively harming competition in the market for set-top boxes.

---

[2]  Plaintiffs defined the tying product as "premium cable."  Cox's particular product was called "Advanced TV."

11

**A.      The Tie**

The evidence presented at trial was sufficient to support a jury finding that

Cox conditioned the sale of Advanced TV services on rental of a set-top box from

Cox.  Throughout the relevant period, Cox's website stated:  "*In order to receive*

*interactive TV services* offered by Cox, such as the interactive programming

guide, on-demand, pay-per-view, and all-digital programming options, *you must*

*rent a digital receiver.*"[3]  J.A. vol. L, at 6165–66 (emphasis added).  If consumers

wanted to get interactive TV services from Cox, "they had to rent that set-top

receiver from Cox."  Id. at 6166.

Further, Colleen Langer, Vice President of Marketing for Cox, testified that

the Cox website for ordering cable "would force you to say what type of box do

you want."  J.A. vol. XXVII, at 4014–15.  When asked to elaborate, she stated:

> [The website] won't let you go any further unless you click one of
> those — check one of those boxes.  You can't order advanced TV
> without having equipment.  So at that point in time the system knows
> that in order to complete your order that this customer is going to
> need either a digital set-top box or advanced set-top box, which

---

[3]  Throughout the trial, there was much testimony designed to determine
exactly which Advanced TV services were and were not available to consumers
through other means, such as by ordering pay-per-view over the phone instead of
through a set-top box.  See, e.g., J.A. vol. L, at 6191; J.A. vol. LI, at 6366–67.
Regardless of which or how many services consumers might have been able to
acquire through other means, Cox conditioned the provision of Advanced TV on
the rental of a set-top box.  In order to acquire Advanced TV services, a consumer
was forced to choose which type of set-top-box or cableCARD they wished to
rent from Cox.  There was no option to order Advanced TV without accepting
equipment rental.  J.A. vol. XXVII, at 4014–18.

12

would be the HD DVR and *they would have to click on it and that price would show up*.

Id. at 4015 (emphasis added). When asked, "[i]s there an option for 'none of the above' or 'I don't want a box' for a customer to say they don't want a box?," Langer responded "[t]he only other option is if they want a CableCARD," "[w]hich they would also have to rent from Cox." Id. at 4016. She also testified that there was no option for customers to order digital cable without also ordering equipment, specifically, "they cannot complete the order" without doing so; "[i]t would error." Id. at 4016–18.

This coercion was not limited to internet sales. Charles Wise, Vice President of Customer Care for Cox, testified that, when customers call for services, "[t]he service representative communicates to the customer that the services that they desire either *require* a DCR or *require* a Set-Top box for those advanced features, and then they're communicated to what the cost of the package is *and what the cost of the equipment is*." Id. at 4040 (emphasis added). As a general matter, Steve Necessary, Vice President of Video Product Development and Management for Cox, testified that "[f]rom 2005 to 2012 in Oklahoma, to fully access all of the content and services . . . customers had to lease set-top boxes from Cox." J.A. vol. LI, at 6416.

13

**B.     Separate Products**

This arrangement, conditioning the provision of premium cable services on the rental of a set-top box, will merit per se condemnation only if premium cable services and set-top boxes are two separate products from the perspective of buyers.  They are.

As an initial matter, Cox stipulated that, based on the nature of consumer demand for premium cable services and set-top box rental, these were separate products.  See J.A. vol. XXIII, at 3440; J.A. vol. II, at 276.  The jury was instructed to find for the plaintiffs on this element.  J.A. vol. III, at 588.  At trial, Steve Necessary also testified that the set-top box and the service were separate products.  J.A. vol. LI, at 6491–92.  Because there is apparently some confusion as to what legal significance Cox intended this admission to have, I will address the separate products analysis by considering those factors the Supreme Court has instructed us to consider:  whether other sellers offer or could offer the products separately, whether customers are charged separately for the two products, and whether the tied product is fungible

First, there was evidence that other sellers did offer the products separately.  Lawrence Harte testified as an expert witness for the plaintiffs and provided his conclusion that other cable companies did provide cable services separate from set-top box rental or purchase.  Id. at 6367.  Specifically, he cited Rogers in Canada and Virgin Media in the U.K.  Id.  Further, there was evidence that

14

numerous other sellers in the United States could also offer the products separately if they so chose. Harte testified that Cisco was already manufacturing a box that was technologically compatible with Cox's Advanced TV service system — the very same box, in fact that Cox was buying from Cisco and then renting to its customers. Id. at 6399–6400. According to the contract between Cox and Cisco, nothing prevented Cisco from selling those boxes directly to customers, separate from the provision of premium cable services. Id. 6376. Further, Cisco's conditional access security function, PowerKEY, was installed on Cisco's set-top boxes and allowed content providers to limit the content accessible on a given box. Id. at 6398–99. Cisco was free to license PowerKEY to other manufacturers and did in fact license it to at least Pioneer, Pace, Panasonic, and Motorola. Id. at 6399–6400. Harte also testified that "Cox did have the technical ability to provide . . . support for customers to buy and use their own set-top boxes" because

> Cox was already allowing retail television devices, in particular, cable modems. You could buy a cable modem at a Best Buy or an Amazon. You could hook it up and get it activated on the Cox system, which is somewhat similar to a set-top box. In fact, it's a form of set-top box, but it just doesn't do television.

Id. at 6367. Specifically, Harte testified that, during the period from 2005 to 2012, Cox did have the technical "ability to bring a TiVo box online that provided two-way services" but that it did not do so. Id. at 6372.

15

More directly to this point, there was an incident in which a customer acquired a Motorola set-top box on eBay and tried to use it to receive Cox Advanced TV services. Cox's response to that incident indicates that it was capable of connecting the box, but decided not to do so. On March 5, 2009, Christine Martin sent an e-mail describing a customer complaint. She stated:

> They are claiming that we can and have to hook up outside boxes because of the FCC Act of 1996. They think we are holding out simply because we are greedy and want to collect "our $42 a month". So, someone needs to call these folks and first of all find out what kind of box they have. I'm assuming that will solve the issue since it likely won't be compatible with our system. And then we'll need to talk them down and explain that we aren't being greedy or breaking any rules.

J.A. vol. XXXVII, at 5000. In a reply e-mail to Christine Martin that same day, Delbert Biggs wrote:

> As I understand, once a true "retail" box is available (which is not available at this time) we will connect with our cable card, but since this customer bought the box on e-bay, it belongs to some cable system as neither Motorola or SA are providing retail boxes at this time.

Id. at 4999. The next day, March 6, 2009, Kevin Rider responded to the e-mail chain that the boxes the customer had purchased were boxes that had been purchased from Motorola by Advanced Media Technologies, Inc., and Time Warner Cable, Inc. Id. at 4996. Then, on April 10, 2009, Terry Shorter wrote to the e-mail chain that the customer had contacted Advanced Media Technologies and Time Warner Cable. He stated, "Both DVR's are no longer in the other cable

16

providers systems & they don't want them back." Id. at 4993. Billy Hill then replied, "Kevin I was not on the last conference call but wasn't it communicated that we would not support there boxes in our system?" Id. Kevin Rider then confirmed, "At this time, other than a TIVO box, or cable card TV, no other device is designed for consumer purchase to operate in our system. *It was mutually agreed on the conference call that we will not support these devices* that [the customer] purchased on Ebay." Id. Whether or not we believe Cox's argument that it did not want to connect the boxes because they were stolen, Cox stated that it was *unwilling*, not unable to connect the box as a technical matter. In sum, there was ample evidence in the record that sellers were capable of selling premium cable services and set-top boxes separately, and that, at least in Canada and the U.K., sellers did sell the products separately.

Second, Cox charged customers separately for service and for set-top box rental. J.A. vol. LI, at 6326–27. And Cox viewed rental revenue and service revenue separately. J.A. vol. XLI, at 5328.

Third, there was evidence that set-top boxes are not fungible. Harte offered testimony about the various features that set-top boxes can include, such as "Netflix and apps, programming guides with skipping the television commercials, multinetwork programming guides, the ability to download a movie on a flash drive and take that with you on the plane." J.A. vol. LI, at 6371. Further, Percy Kirk, Senior Vice President and General Manager for Cox in Oklahoma, testified

17

that boxes were constantly being updated with new and better features and functionality. J.A. vol. L, at 6252. Steve Necessary also testified that different boxes displayed different interactive guides. Id. at 6449. Given these various features and updates, consumers would not see all set-top boxes as equivalent.

Because premium cable services and set-top boxes were sold separately by other sellers, could be sold separately by additional other sellers, were billed separately to buyers, and were not fungible, they were separate products, as Cox stipulated.

To the extent the majority concludes otherwise, it appears to do so on the basis that, as a technical matter, it does not believe that Advanced TV from Cox cannot be provided without a set-top box from Cox. For this conclusion, it relies upon factual findings from the Second Circuit in Kaufman v. Time Warner, 836 F.3d 137 (2d Cir. 2016). Specifically, the majority cites Kaufman for the propositions that (1) cable providers must "code their signals to prevent theft," and "providers do not share their codes," so, in order "to be useful to a consumer, a cable box must be cable-provider specific, like the keys to a padlock"; (2) that the FCC was unable to force a competitive retail market for set-top boxes, at least in part due to "shortcomings in the new technologies designed to make premium cable available without set-top boxes"; and (3) that "one FCC regulation actually caps the price that cable providers can charge customers who rent set-top boxes." Maj. Op at 18–19 (citing Kaufman, 836 F.3d at 144, 146, 147).

18

Evidence supporting these findings presumably was presented to the court in Kaufman, but it was not presented to the court in this case. The majority notes that the FCC regulation capping set-top box rental prices is not addressed by either party in this case. Maj. Op. at 19 n.4. Further, there was evidence presented in this trial that Cisco could have sold or rented its set-top boxes directly to customers instead of selling only to Cox, that other manufacturers had licensed PowerKEY from Cisco, enabling them to also make boxes that would connect to Cox's system, and that Cox was technologically capable of connecting set-top boxes to its system whether or not they were rented from Cox, but chose not to do so.

The majority concludes, "plaintiffs failed to show that Cox's tie, as opposed to *consumer choice*, defeated these products or kept their manufacturers from selling them." Maj. Op. at 28. It asserts that "[i]f enough customers demanded to buy set-top boxes or set-top-box alternatives directly from manufacturers, the manufacturers could have chosen to sell them directly; Cox's tie did not preclude them from doing so." Id. at 27. This characterization ignores the reality of tying arrangements. Cox's customers could not demand boxes from manufacturers. As discussed above, if customers did acquire boxes from another source, Cox refused to connect them. Further, the nature of a per se tying claim entitles us to presume that the lack of consumer demand was a direct effect of Cox's requirement that all its customers rent their set-top boxes from Cox rather than from any other source. Certainly such an arrangement is likely to increase barriers to entry for other potential sellers of set-top boxes because they must compete with a

19

monopolist who can benefit from economies of scale and who has already dominated the market-share. Fortner I, 394 U.S. at 509; see also Jefferson Par., 466 U.S. at 14.

The evidence presented to the jury was sufficient for it to conclude that premium cable services and set-top boxes were separate products from the perspective of buyers, and that this is not a case of "zero foreclosure" because other sellers were able to sell the products separately.

## C.    Market Power

The plaintiffs also presented ample evidence that Cox controlled a substantial share of the market for video services in Oklahoma City. According to Cox's calculations, from the third quarter of 2009 to the third quarter of 2011, Cox controlled between 68% and 71.5% of the market for video services in Oklahoma City. J.A. vol. XLII, at 5375–76. Those calculations did not take into account "over-the-top" services Cox provides, which are streaming video services such as Hulu and Netflix, but Jennifer Rich, Director of Competitive Strategy for Cox, testified that only 1.5% of customers had "chosen over-the-top video instead of paid TV." J.A. vol. XXVII, at 4114. She also testified that 35% to 40% of Cox customers subscribed to over-the-top services in addition to cable services. Id. at 4116–17. This indicates that consumers did not view over-the-top services as a substitute for cable services and, even if over-the-top services should have been included in the tying product market, the 1.5% of customers that chose over-the-top services instead of cable would not have a material effect on Cox's 68% to 71.5% market share.

## III

Satisfied that the evidence presented at trial was sufficient to support the jury verdict, I must make one additional point which perhaps explains why my views differ from those of the majority. When considering a motion for judgment as a matter of law, it is not our job to decide the case anew, but to uphold the jury verdict unless "the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found." Weese v. Schukman, 98 F.3d 542, 547 (10th Cir. 1996) (quoting Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir. 1991)). This is particularly true in light of the fact that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." Fortner I, 394 U.S. at 503; see also id. at 505 ("[S]ummary judgment in antitrust cases is disfavored."); Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 467 (1992) ("This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" (quoting Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579 (1925))); Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 43 (rejecting a *per se* rule or rebuttable presumption of market power and instead requiring proof of market power in each case). We are not dealing here with a situation in which one party has asked us to review a grant of summary judgment before a jury has heard all the evidence. But rather, we are dealing with a situation in which the jury has heard that evidence and found for the plaintiff. Thus, when compared to our review of a grant of summary judgment, we should be *more* hesitant to overturn the verdict of a jury after it

21

has considered all the facts presented at trial.  Our role on appeal is to determine only whether there was sufficient evidence in the record to support the jury's decision.  Here, there was.

I respectfully dissent.  I would reverse the grant of judgment as a matter of law, reinstate the jury's verdict on the issue of liability, and remand for a new trial on the issue of damages.